**Duane L. LLOYD, Sr., Plaintiff,**

v.

**BRIDGEPORT BRASS CORPORATION,
d/b/a Olin Brass, Indianapolis,
Defendant.**

**No. IP 92–26–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 25, 1993.

Vincent L. Scott, Indianapolis, IN, for plaintiff.

Robert E. Highfield, Lester H. Cohen, Barnes & Thornburg, Indianapolis, IN, for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

Defendant Bridgeport Brass Corporation, d/b/a Olin Brass, Indianapolis, has moved for summary judgment in this action brought by Duane L. Lloyd, Sr. pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). For the reasons set forth, the motion is GRANTED.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background*

Bridgeport Brass Corporation ("Bridgeport") is the largest integrated producer of brass mill products in the United States. It produces brass sheet, rod, tube, and wire, principally for use in the automotive and housing industries. Bridgeport was purchased in 1988 by Olin Corporation ("Olin"). Both before and after this purchase, Bridgeport's Indianapolis facility (the "Indianapolis plant") employed approximately 750 employees. Of these, some 550 to 600 were hourly production and maintenance employees, and approximately fourteen percent were minorities.

Olin's relationship with the Indianapolis plant's employees was governed by a collective bargaining agreement ("CBA") that had been entered earlier by Bridgeport and the United Steelworkers of America ("USW"). Shortly before Olin bought Bridgeport, Bridgeport employees had agreed to concessions in their labor contract, and to an extension of their CBA's expiration date to May 7, 1989. The Indianapolis plant's hourly employees were unhappy with the concessions, and Olin anticipated that they might launch an economic strike against the company when the contract expired.

Olin therefore took steps to insure that plant operations would continue if a strike occurred. One step was the hiring of Kiser & Brown Investigative Group ("KBI") to handle security needs during the strike. Another step was the creation of a specific standard for the discharge of any striking employee. This standard was formulated by Bridgeport administrative services manager Bob Stultz, who recommended all disciplinary actions for the company, and Olin industrial relations director Paul Fultz, who had to approve all discipline in advance. Under the standard, a picketer could not be fired unless his or her conduct both rose to the level of a dischargeable offense, as defined by National Labor Relations Board ("NLRB") precedent, and was adequately documented by reliable evidence. Specifically, this meant that a picketer could be discharged only if (1) he or she committed acts that were threatening, intimidating, or coercive toward Olin's nonstriking employees, vendors, or other agents, and (2) Olin (through Stultz and Fultz) obtained solid evidence of such acts, either on videotape or through the personal report of an Olin management-level employee or a KBI agent.

### B. *Plaintiff's Employment Before the Strike*

Plaintiff Duane Lloyd worked as an hourly employee for Bridgeport for some twenty years. For eighteen of these years, Lloyd was happy; he held a variety of jobs, received regular raises, and did not receive

any discipline he thought was unfair. Things changed on July 3, 1987, however, when Lloyd was fired for falsifying work records. Lloyd disagreed with the stated grounds for his termination, so later that month he filed a charge with the Indiana Civil Rights Commission (the "ICRC charge"), alleging that Bridgeport had fired him because of his race. The USW brought Lloyd's discharge to arbitration in September 1987, and on February 8, 1988 the arbitrator ordered Bridgeport to reinstate Lloyd with backpay.[1] Lloyd claims that shortly after this, Stultz told him that he (Stultz) had no hard feelings about the reinstatement, because it would give Stultz "another shot" at Lloyd and his job. Stultz denies making the remark.

Between the time of Lloyd's reinstatement and his termination, two events of some importance to this case transpired. The first happened in May 1988, when Lloyd was elected president of USW Local 4266—a position he held until his discharge. The second occurred on April 5, 1989, when Gloria Edmonds, a black female employee, started an argument with Lloyd in his office at the Indianapolis plant, and directed racial slurs and profanity toward him. Lloyd, rather than respond in kind, simply asked Edmonds to leave and go calm down. Sometime later, when Lloyd went onto the plant floor, Edmonds accosted him again. Lloyd listened for a moment, then "couldn't take it anymore," and unleashed his own stream of profanity and shouting at Edmonds. Later that day, Stultz suspended Lloyd for three days over the incident, on the ground that his outburst had included threats against Edmonds and her family. Edmonds, in contrast, was given only a warning for her role in the altercation.

### C. The Strike and Discharge

Bridgeport's hourly employees went on strike May 7, 1989, and remained on strike until August 21, 1989. During the strike, some 200 to 300 employees worked a picket line outside the plant. Lloyd, as local union president, played an active role in the picketing—so active, in fact, that he was discharged for misconduct on May 15, 1989. Stultz and Fultz determined that Lloyd's conduct met the standard they had earlier established for discharge—i.e., it rose to the level of a dischargeable offense, and they had sufficient evidence in the form of videotapes, Stultz's first-hand knowledge,[2] and reports from KBI employees Charles Brown and Joe Buyoc. Lloyd's discharge letter stated:

> [Y]ou were profanely and verbally abusive to Plant Manager, Larry Stewart as he left the plant Saturday, May 13, 1989 at approximately 7:30 p.m. You threatened Chuck Brown of Kiser & Brown Investigative Group with bodily harm on several occasions. You threatened a truck driver leaving the plant on this date in a most vile and vulgar manner. You have been profane and verbally abusive to salaried employees, vendors, temporary workers, etc. on numerous occasions as they entered and left the plant. The Company will not tolerate behavior of this nature. . . .

Plaintiff's Opposing Memorandum, Ex. 4.

Lloyd denies having threatened anyone while on the picket line. He has admitted, however, that he (1) called Stewart a "motherfucker"; (2) said to Stewart, "Fuck you and your no good plant"; (3) called mill superintendent Bob O'Neal a "fag"; (4) told a security person that he would "butt fuck" his daughter; (5) said to Brown that he was going to "take him out of this"; (6) confronted Brown in a very close, face-to-face manner; (7) said to Brown, "How would you like it if I fucked your old lady?"; (8) confronted Buyoc face-to-face; (9) called a security guard a "big mouth fagot motherfucker"; (10) called another security guard a "black Uncle Tom mother-

---

1. Lloyd thereafter abandoned the ICRC charge.

2. Specifically, Stultz reported that Lloyd (1) crossed the picket line, confronted KBI's Richard Kiser toe-to-toe, and threatened Brown; (2) confronted Joe Buyoc, a KBI guard, attempted to provoke a fight with him, and threatened his

life; (3) shouted profanities at Plant Manager Larry Stewart and followed his car into the road after it left the parking lot; and (4) slapped a bus containing replacement workers as it crossed the picket line.

fucker"; and (11) slapped a bus filled with replacement workers leaving the plant. *See* Deposition of Duane L. Lloyd, Sr. at 448–56 [hereinafter "Lloyd Dep."]. Lloyd also has admitted that he learned, after his firing, that these acts were dischargeable offenses under NLRB precedent. *Id.* at 396, 413–14, 461–62.

Three employees besides Lloyd were discharged for picket line misconduct during the strike: Harold Baker, Steve Alford, and Joe Thurman. Baker and Alford, like Lloyd, were fired on May 15, 1989. Thurman was given a warning on May 15, 1989, but was terminated on May 31, 1989, after Stultz and Fultz determined that his conduct during the intervening period had risen to a dischargeable level. Baker, Alford, and Thurman are white; Lloyd is black.

Lloyd brought this action on January 8, 1992, claiming that his discharge violated Title VII because it was improperly based on race, or alternatively, was in retaliation for his filing of the ICRC charge in 1987. Olin moved for summary judgment on August 31, 1992. Lloyd timely responded and Olin timely replied, so the motion is ready for ruling.

## II. SUMMARY JUDGMENT STANDARD

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact in evidence of record. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Schroeder v. Barth, Inc.,* 969 F.2d 421, 423 (7th Cir.1992). If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present adequate, specific facts which show that a genuine issue exists. *Celotex Corp. v. Catrett,* 477 U.S.

317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d ·538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.1992). The opposing party, however, must do more than create a mere "colorable" factual dispute to defeat summary judgment; disputed facts must be material—i.e., outcome determinative. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Schroeder,* 969 F.2d at 423; *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir.1992).

■ In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party, and must resolve any doubt against the moving party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992); *Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland, Ltd.,* 969 F.2d 329, 331–32 (7th Cir.1992). If a reasonable fact-finder could find for the opposing party, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992). If the standards of Rule 56(c) are not met, however, summary judgment becomes mandatory. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 248–50, 106 S.Ct. at 2510–11; *Shields Enterprises,* 975 F.2d at 1294. Summary judgment is not a disfavored procedural shortcut; rather, it is an integral part of the federal rules, which are designed to secure the expeditious determination of all actions, *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555—including Title VII cases. *United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267–68 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

## III. DISCUSSION

### A. *General Burden–Shifting Standard*

■ Lloyd's claim, which alleges that his discharge violated Title VII because it was based on race discrimination or retaliation,

or both, is one of individual disparate treatment. As such, the claim is subject to the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and their progeny. *See Kizer v. Children's Learning Center*, 962 F.2d 608, 611–12 (7th Cir.1992); *United Association*, 916 F.2d at 1265; *Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1026–27 (7th Cir.1989); *Williams v. Williams Elec., Inc.*, 856 F.2d 920, 922–23 (7th Cir.1988).

Under the *McDonnell Douglas/Burdine* analysis, Lloyd carries the initial responsibility of establishing a prima facie case that he was terminated for discriminatory and/or retaliatory reasons. If Lloyd does this, the burden of production shifts to Olin to articulate a legitimate, nondiscriminatory/nonretaliatory reason for the termination. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Morgan*, 867 F.2d at 1023. If Olin provides such a reason, any inference of discrimination "dissolves," and Lloyd is left with the burden of showing, in form sufficient to withstand summary judgment, that Olin's proffered explanation is only a pretext for discrimination and/or retaliation. *Burdine*, 450 U.S. at 253–55, 101 S.Ct. at 1093–95; *United Association*, 916 F.2d at 1265; *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir.1989); *Morgan*, 867 F.2d at 1023–27. Absent "direct evidence" of discrimination or retaliation, *see McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686–87 (7th Cir.1991), Lloyd can prove pretext by showing that (1) Olin's stated reason has no basis in fact, (2) Olin's reason has a basis in fact, but was not the real reason for his discharge, or (3) Olin's reason was the real reason, but was insufficient to warrant discharge. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1114 (7th Cir.1992), *aff'g*, 760 F.Supp. 729 (N.D.Ind.1991); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1303 n. 5 (7th Cir.1991); *Smith*, 876 F.2d at 1319; *LaMontagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1414–15 (7th Cir.1984).

### B. Race Discrimination

#### 1. Prima Facie Case

█ To establish a prima facie case of race discrimination, Lloyd must present facts which tend to show that (1) he is a member of the protected class, (2) he conducted himself in a manner consistent with Olin's legitimate business expectations,[3] (3) he suffered from an adverse employment action, and (4) similarly situated white employees were treated more favorably. *Kizer*, 962 F.2d at 611–12; *Williams*, 856 F.2d at 923. If Lloyd cannot establish any one of these elements, summary judgment for Olin is proper. *Reed v. Amax Coal Co.*, 971 F.2d 1295, 1299 (7th Cir.1992).

█ The first and third elements are easily satisfied here, because Lloyd is black and was discharged. It also appears that Lloyd has adequately demonstrated the fourth element, because he has presented evidentiary material which, though far from conclusive, permits an inference that similarly-situated white employees—i.e., white picketers who engaged in threatening, intimidating, or coercive activity while on the picket line—were treated more favorably than he.[4] *See Kizer*, 962 F.2d at

---

**3.** This element usually requires a showing that the employee was performing his or her job consistent with the employer's legitimate business expectations. *See Williams*, 856 F.2d at 923. However, because this case focuses on conduct during a strike rather than behavior on the job, this prong of the prima facie test requires some modification. *See Oxman v. WLS–TV*, 846 F.2d 448, 452 n. 2 (7th Cir.1988) (such modification is occasionally necessary).

**4.** The parties appear to disagree over the meaning of "similarly situated" in this case. Lloyd appears to contend (at least at points) that the similarly situated employees here are those who were fired during the strike—i.e., Baker, Alford, and Thurman. This approach defines the class in terms of discipline imposed by the employer. Olin contends that the similarly situated employees are those who engaged in picket line misconduct sufficient to warrant discharge, which defines the class more in terms of employee conduct.

Olin's definition, to the extent it makes a difference, is the correct one. The relevant inquiry in *McDonnell Douglas/Burdine*-type disci-

612. Bridgeport employee James Wells, who participated in the strike and apparently is white, has said that he cannot distinguish between the acts for which Lloyd ostensibly was discharged, and acts committed on the line by other picketers who were not fired (including himself). Affidavit of James Wells, ¶ 10 (attached as Exhibit B to Plaintiff's Opposing Brief) [hereinafter "Wells Aff."].[5] In addition, the record raises questions about whether Joe Thurman—who was "clearly louder and more verbally abusive than Duane Lloyd," Wells Aff., ¶ 12, and made threats against company-related personnel, *see* Defendant's Reply Brief, Ex. 17 (disciplinary notice to Joe Thurman), yet, unlike Lloyd, received a warning before being terminated, *id.*—was treated more favorably than Lloyd.

However, Lloyd has failed to demonstrate the second element of a prima facie case, because he has not shown that he conducted himself in a manner consistent with Olin's legitimate business expectations. *See Reed*, 971 F.2d at 1299 (spelling out evidentiary burden). Lloyd's only offering on this point is his statement that "picketing ... was consistent with what was expected of the employees at that time as the majority of hourly employees were picketing the plant during that period of time." Plaintiff's Opposing Brief at 17. However, as Olin has pointed out, Lloyd was not discharged *for* picketing—he was discharged for engaging in coercive, threatening, and intimidating behavior *while* picketing. Olin agrees that lawful picketing by Lloyd or any other employee is within its legitimate business expectations. *See* Defendant's Reply Brief at 6; *see also* Affidavit of Paul Fultz, ¶ 5 [hereinafter "Fultz Aff."] ("I have learned through years of experience and in close consultation with labor counsel that striking employees have the right ... to picket peacefully during an economic strike"). Olin contends, however, that Lloyd's misconduct fell outside the scope of lawful picketing,

and thus not within its legitimate business expectations, and the evidence supporting this contention is uncontradicted. *See, e.g.,* Fultz Aff., ¶ 9; Affidavit of Robert Stultz, ¶¶ 6–8 [hereinafter "Stultz Aff."].

### 2. Pretext

Even if the Court were to find that Lloyd had established a prima facie case, however, his race discrimination claim would still fail, because Olin has proffered a legitimate, non-pretextual, and well-supported reason for the discharge. As noted earlier, Olin determined that it would not fire any striker unless the striker's picket-line actions constituted dischargeable conduct (i.e., coercive, threatening, or intimidating behavior), and were sufficiently documented. Stultz and Fultz claim that they determined that Lloyd's actions on the picket line met these criteria, and that they discharged him on that sole basis, without regard to any other factor. *See* Fultz Aff., ¶¶ 7–9; Stultz Aff., ¶¶ 6, 11.

Lloyd has not raised any genuine issue concerning the legitimacy of this explanation. Initially, the explanation has a basis in fact; Lloyd, as already mentioned, has admitted to several specific incidents of misconduct while on the picket line. *See supra* at 403–04; Lloyd Dep. at 448–56. In addition, the proffered reason was sufficient to warrant discharge under NLRB precedent. *See Clear Pine Mouldings, Inc.*, 268 NLRB 1044, 1046 & n. 14, 1048 (1984) (citing *NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519, 527 (3d Cir.1977)) (vague threat by striker to "straighten ... out" other employee sufficient to sustain discharge), *enforced*, 765 F.2d 148 (9th Cir. 1985); *see also Tube Craft, Inc.*, 287 NLRB 491, 492 (1987) (obstruction of entrance to plant, even if access not completely blocked, supports discharge); *GSM, Inc.*, 284 NLRB 174, 175 (1987) (general facilitation of misconduct by other strikers supports discharge). Finally, nothing in the record indicates that Olin's explanation did

---

pline cases is whether "two employees are involved in or accused of the *same offense* and are *disciplined in different ways.*" *See Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317, 322 (5th Cir. Unit A 1981) (emphasis added).

**5.** Lloyd in his brief has stated that Wells is white, *see* Plaintiff's Opposing Brief at 18, but Wells himself has not indicated his race.

not embody its real reason for discharging Lloyd. The testimony of Stultz and Fultz is uncontradicted, except by Lloyd's "self-serving remarks," which are "insufficient to raise doubt as to the credence of [Olin's] explanation for termination." *Billups,* 922 F.2d at 1303; *see also Williams,* 856 F.2d at 924; *Grohs v. Gold Bond Bldg. Prods.,* 859 F.2d 1283, 1288 (7th Cir.1988) ("genuinely held" belief by employer sufficient to show lack of pretext), *cert. denied,* 490 U.S. 1036, 109 S.Ct. 1934, 104 L.Ed.2d 405 (1989); *Pollard v. Rea Magnet Wire Co.,* 824 F.2d 557, 558 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

## C. *Retaliation*

■ To establish a prima facie case of retaliatory discharge, Lloyd must show (1) that he engaged in a legally protected activity, (2) that Olin subsequently took an adverse employment action against him, and (3) that the employment action was caused by Lloyd's participation in the protected activity. *Samuelson,* 976 F.2d at 1114–15; *Hamann v. Gates Chevrolet, Inc.,* 910 F.2d 1417, 1420 (7th Cir.1990); *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985). Causation cannot be inferred from the presence of the other two elements. Rather, it "must be proved in its own right," *Hamann,* 910 F.2d at 1420, which, at the summary judgment stage, requires Lloyd, at the least, to put on evidence of circumstances that justify an inference of retaliatory motive. *Samuelson,* 760 F.Supp. at 739.[6]

■ Here, Lloyd has shown that he engaged in a protected activity (filing the ICRC charge) and that he suffered an adverse employment decision. He has failed, however, to sufficiently demonstrate any causal connection between these two incidents. Lloyd points to Bob Stultz's remark

that Lloyd's reinstatement gave him "another shot" at Lloyd, and to his suspension after the April 1989 argument with Gloria Edmonds, as providing evidence that Olin fired Lloyd in retaliation for the ICRC charge. This evidence, however, does not yield the inference Lloyd seeks. Both the charge, made in July 1987, and Stultz's alleged comment, made in February 1988, are too remote in time to be connected causally to Lloyd's firing in May 1989. *See Samuelson,* 976 F.2d at 1115 (significant time lapse discounts causal connection); *Hamann,* 910 F.2d at 1420–21 ("rapidity and proximity in time" may create inference of causation); *see also McCarthy,* 924 F.2d at 686–87 & n. 4 ("stray remark" not enough by itself to show causal connection). The fact that Lloyd was suspended a month before his termination—even assuming that he was treated more harshly than Edmonds—does nothing to cure the effect of this time lapse. Indeed, the only reasonable inference that can be drawn from the evidence of record is that Lloyd's suspension was unrelated to either his firing or the ICRC charge.[7]

Because Lloyd has failed to present sufficient evidence of causation, he has failed to state a prima facie case of retaliation. Olin therefore is entitled to summary judgment on this claim. *See Reed,* 971 F.2d at 1299.[8]

## IV. CONCLUSION

For the reasons discussed, Olin's motion for summary judgment is GRANTED, and Lloyd's claims are DISMISSED WITH PREJUDICE.

SO ORDERED.

---

**6.** Actually, Lloyd appears to have abandoned his retaliation claim, having completely ignored the issue in his opposing brief.

**7.** Of course, any claim that the suspension itself was retaliatory would fail because it (like Lloyd's firing) is too remote in time from the ICRC charge to be causally connected to it. *Samuelson,* 976 F.2d at 1115.

**8.** Even if a prima facie case existed, Lloyd would be unable to show that Olin's explanation for his discharge is pretextual, as discussed fully *supra* at 406–07 with regard to Lloyd's race discrimination claim.