**Lisa A. SINK, Plaintiff,**

v.

**KNOX COUNTY HOSPITAL, d/b/a Good Samaritan Hospital, and the Board of Trustees of Knox County Hospital, Defendants.**

**No. TH 93–220–C.**

United States District Court,
S.D. Indiana,
Terre Haute Division.

Sept. 19, 1995.

Barbara J. Baird, Macey Macey & Swanson, Indianapolis, IN, for plaintiff.

David J. Mallon, Jr., Sherry A. Fabina–Abney, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter comes before the Court on the motion for summary judgment filed by defendants Knox County Hospital, d/b/a Good Samaritan Hospital and the Board of Trustees of Knox County Hospital (collectively the "Hospital"). The Hospital claims it is entitled to summary judgment against plaintiff Lisa A. Sink ("Sink") on the grounds that the conduct about which she complained was not sufficiently severe or pervasive to constitute hostile environment sexual harassment, and because the Hospital took prompt and appropriate corrective action. Further, the Hospital contends that Sink was discharged for lying on two occasions and jeopardizing client care, rather than in retaliation for filing an EEOC charge. For the reasons that appear below, this Court finds the defendants' motion to be well-taken in part, and therefore **GRANTS** summary judgment, in part, in favor of the Hospital on the claim of sexual harassment, and **DENIES** summary judgment on the claim of retaliation.

### I. FACTUAL & PROCEDURAL BACKGROUND

#### A. The Alleged Harassment

Sink's association with the Hospital began on September 9, 1991, when she was hired as a Chemical Dependency Therapist II for the Comprehensive Community Mental Health Center ("CCMHC"), which is operated by the Hospital. Her work in the Chemical Dependency Department ("CD") of the

CCMHC brought her together with three male co-workers, Mike Joyce ("Joyce"), Keith Frazier, and Rick Warthan ("Warthan"). Individually or in teams of two the therapists administered various programs for CCMHC, including an Intensive Outpatient Program ("IOP"), various treatment groups, relapse prevention groups, and a Substance Abuse Intervention Program. Sink served as a co-therapist with Warthan in IOP group sessions. Although Sink, who has a bachelors degree in criminology, was not a certified chemical dependency therapist, she was working toward her certification and receiving training at CCMHC. Warthan, who was certified and had a masters degree in social work, was employed as a psychiatric social worker with the CD department. He had more experience than Sink, but he was not her supervisor. Initially, Sink was supervised by Jeff Brown, but he resigned in March of 1992. Jill Bailey, who was the Hospital's Coordinator of Clinical Services, assumed responsibility for supervision of the CD department and functioned as her immediate supervisor until the date of Sink's discharge, September 17, 1992. Both Brown and Bailey were supervised by John Vanderbeck, Ph.D., who was the Associate Director/Clinical of CCMHC.

Sink complains of three incidents that she describes as sexual harassment, and several more that she describes as "related to" sexual harassment. In early February, 1992, Sink and Warthan were planning to attend an out-of-town conference to be held on February 14, 1992. During a discussion about the conference Warthan allegedly made a comment about Sink giving him an early birthday present and their spending the night in a hotel.[1] Sink admits that she understood this to be a joke, but she indicated to both Warthan and Brown that she did not appreciate it. Sink Dep. at 54. Brown's response was to tell her not to take it personally because it was only a joke. Sink Dep. at 55.

The next two incidents occurred while Sink and Warthan were driving back from the conference together. They began discussing

Sink's relationship with her boyfriend, and Warthan asked her if she was sleeping with him. Sink told him she did not wish to discuss it and he dropped the subject. Sink Dep. at 78, 83. Next the conversation turned to a discussion about a patient of Warthan's who had an eating disorder and was experiencing sexual problems. Warthan stated that his patient did not know how to stimulate herself and he asked Sink if she knew how to do that. Sink Dep. at 78–79. Warthan then indicated that he was uncomfortable trying to treat this patient and that he was considering referring her to another therapist. No other comments were made about this topic. Sink Dep at 79, 87. Sink did not report any of these incidents or comments to anyone (other than telling Brown she did not like the joke) at the Hospital until approximately the first week of May, 1992. Sink Dep. at 96, 108.

In the category of incidents that Sink claims are related to sexual harassment are the following:

1. In February, 1992, during another conference, Warthan allegedly "diagnosed" Sink as "histrionic and borderline" (Sink Dep. at 24);

2. In April, 1992, Warthan told patients during a group session that he would have to lead the group since Sink had come unprepared (Sink Dep. at 20);[2]

3. On or about May 4, 1992, Warthan, after overhearing a conversation in which Sink indicated a desire to date a certain patient, asked her if she would date a patient, warned her not to, and inquired about what she did during her therapy sessions; he also reported the incident to their supervisor, Bailey (Sink Dep. at 18, 102–03, 107; Bailey Dep. at 133–35);

4. Later that same day, during the break in a group session Sink was co-facilitating with Warthan, their former supervisor came in and gave them some pens from his new employer, another mental health facili-

---

1. The trip to the conference was not an overnight trip. Sink Dep. at 71, 76–77.

2. Sink admits having been unprepared. Sink Dep. at 20.

ty, which contained the name and phone number of that facility; several patients were also in the room, and Warthan indicated to Brown that he had given Sink "supervision" that day, and then he told Sink to keep the pen because she might need the number (Sink Dep. at 18–19, 110–114);[3]

5. Sometime in May, 1992, Warthan's wife stopped by CCMHC to get some money from Warthan, who was in Sink's office at the time; the bill he handed her dropped to the floor and when she picked it up he patted her head and said "good doggie," at which his wife laughed, but Sink felt this was Warthan's way of exhibiting dominance over women (Sink Dep. at 28–29);

6. On or about May 15, 1992, Warthan reported to Bailey that Sink was not properly handling the patients' charts, some of which he found in her office in various stages of completion; the following work-day (May 18, 1992) Bailey questioned Sink about the charts and told her to complete them and not to leave them in her office overnight, which was a violation of Hospital policy (Sink Dep. at 268–71; Bailey Dep. at 140–48);

7. On May 18, 1992, during a group session at which Sink was present, Warthan told the group that he and Joyce intended to make some improvements in the CD department, without mentioning Sink as a member of the department (Sink Dep. at 27);

8. On several unspecified occasions Warthan told Sink that if he were her supervisor she would be on probation or fired (Sink Dep. at 25, 93, 329, 527–28);

9. After Sink's May 21, 1992, complaint to the Hospital's Human Resources Department about all of these inci-

dents, Bailey asked her why she took the problem "across the street," referring to the Human Resources office, and also told Sink not to talk to any more people about the problem (Sink Dep. at 195–98, 200, 202);

10. In early June, 1992, Sink discovered that no patients had been referred by either Warthan or Joyce to her relapse prevention therapy group scheduled to begin on June 4, 1992, which would reduce the number of clinical hours Sink could work (Sink Dep. at 196–98, 272–73, 284);

11. Also in early June, 1992, after Warthan had been "counseled" for sexual harassment, Bailey asked Sink to continue conducting therapy sessions with Warthan and to take on more assignments during which she would work with him (Sink Dep. at 190);

12. On or about July 10, 1992, during a CD Department meeting, Warthan and Joyce made negative remarks to and about Sink in Bailey's presence, and Bailey did not reprimand or otherwise correct them for such conduct (Sink Dep. at 187–90);

13. During the July 10, 1992, CD department meeting, attended by Bailey, Warthan, Joyce and Sink, Bailey expressed concern about how the charges Sink filed with ICAADA, the state credentialling organization for alcohol and substance abuse counselors, would affect the funding of the CD department (Sink Dep. at 497–98);

14. On more than one occasion from May, 1992, to September, 1992, Bailey told Sink not to discuss the sexual harassment problem with anyone, and on or about July 9, 1992, Bailey said she was concerned about how the sexual harassment issue was affecting Sink's work and indicated that she might have to cut Sink back

---

3. Sink reports telling Warthan later she did not appreciate his comments and asked him to stop, to which he replied that he was going to keep the "anxiety up" on her. Sink Dep. at 19, 126–27, 133–35.

to part-time work if she did not keep silent about it (Sink Dep. at 198–99).

Sink describes these incidents alternatively as "gender-based hazing," conduct related to sexual harassment, intimidation tactics, or retaliation. With the exception of Bailey's admonition to keep quiet, Sink does not relate any other incidents of this type after the July 10, 1992, meeting. During that meeting Bailey assigned Sink the task of watching a video and preparing questions based on the video for a group session on the following Monday. Sink could not find the video on Monday, did not prepare specific questions for the session, then allowed Bailey to believe that she had prepared the questions but had left them at home. Sink Dep. at 304–11. She later admitted to Bailey that she had not prepared any questions. At Sink's next supervision meeting with Bailey she was given a copy of an Employee Counseling Record, indicating that she had formally been disciplined for lying about completing the questions and for being unprepared for a session. Def's Ex. 9, Sink Dep., Vol II. This document specifically informed Sink that if she were "caught in another false statement—employment [would] be immediately terminated." *Id.*

The next incident occurred in September, 1992. Sink was scheduled for outpatient surgery on Monday, September 14, 1992, for which she had arranged a day off. Bailey Dep., Vol. II at 78, Sink Dep. at 243. On Thursday before the surgery, Sink informed the department secretary that she would be back to work on Tuesday, September 15, 1992, but that she was going to call in sick on Wednesday, September 16, 1992, because she had a job interview scheduled. Sink Dep. at 243, 395. The secretary informed Bailey of Sink's plan and Bailey, after consulting with Vanderbeck, decided to wait and see what Sink did. Bailey Dep. at 76–81, Vanderbeck Dep. at 39, Hall Aff. ¶ 7. Sink called in sick on Wednesday, September 16, 1992, and also went to the job interview. Bailey Dep. at 80–81, Sink Dep. at 394–400. She was discharged upon her return to work on September 17, 1992. The discharge report indicated she was discharged because of "lack in her ability to be truthful, and jeopardizing client care." Def's Ex. 16, Sink Dep.; Bailey Dep., Vol. II at 84.

### B. The Hospital's Response

Sink complained to Vanderbeck about Warthan's conduct on or about May 5, 1992, and he told her to be more assertive with Warthan and that he would talk to Bailey and that Sink should report the incidents to Bailey. Sink Dep. at 266–67; Vanderbeck Dep. at 10–11. Because Vanderbeck was on vacation the rest of that week, he did not talk to Bailey until approximately May 18, 1992. Nevertheless, Sink reported the incidents to Bailey on or about May 7, 1992, and Bailey said she would check into it. Sink Dep. at 58–59. After Vanderbeck returned, he and Bailey discussed the problem and Bailey began an investigation. Vanderbeck Dep. at 11–12. Sink then complained about Warthan's conduct to Donald Demas, the Hospital's Director of Human Resources, on May 20 and 21, 1992. Demas Dep. at 11–14, Sink Dep. at 129–32. An investigation was undertaken, which culminated in a decision by Vanderbeck, Bailey and Demas to "counsel" Warthan by warning him about his inappropriate behavior and educating him about sexual harassment. Demas Dep. at 32; Bailey Dep. at 195–99. The counseling occurred on or about May 29, 1992, at which time Demas contacted Sink to let her know how the problem was being handled. Bailey Dep. at 197, 208–09; Demas Dep. at 30.

Sink agreed to continue to try to work with Warthan in groups, but arrangements were made so that they would not be alone together. Bailey Dep. at 191–93, 198–99. In early June, 1992, Sink informed Bailey and Vanderbeck that she did not want to move her office away from Warthan's, but that she wanted him to move. At about that same time she requested that she not be assigned to do any more groups with him. The Hospital agreed to both requests. Bailey Dep. at 211–13, Sink Dep. at 196–98, 272–73, 284. Sink filed an EEOC charge on June 9, 1992, and a Fair Treatment Complaint, claiming retaliation, with the Hospital's Human Resources Department on June 16, 1992. Demas Dep. at 34–35; Plf's Ex. 42; Def's Exs. 4 and 5. The Hospital investigated her com-

plaints and reported their findings to her on June 23, 1992, in addition to taking the action of moving Warthan's office and reassigning Sink to work only in Joyce's groups.

By June 30, 1992, Sink expressed her satisfaction with how the situation had been handled. Sink Dep. at 291, Def. Ex. 8. In a note she wrote to Demas in response to the Fair Treatment Complaint report, she said,

> I would like to end this by saying thank-you to Mr. Demas for being the best supportive person throughout all of this. Also, I would like to thank my supervisor Jill Bailey and Dr. Vanderbeck for taking the action they did on June 15, 1992 4:00 p.m. I feel really good about how the situation has ended. Dr. Vanderbeck checked back with me the following week to see how things were going and reassured me that he wanted what was best.... Jill Bailey has also instructed me to let her know if any problems arise in the future and to come to her with any issues or concerns.... Even though I don't see things the way Dr. Vanderbeck or Jill Bailey see them, I feel the situation has been taken care of by them working together.

The note was signed Lisa Sink and dated June 30, 1992.

## II. STANDARDS

### A. SUMMARY JUDGMENT STANDARDS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the movant must demonstrate the absence of a genuine issue of fact for trial, if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with evidence of a genuine factual dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The nonmovant must set forth specific facts to show that a genuine issue exists.

*See Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). The opposing party cannot meet this burden with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989); *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 934–944 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In other words, the disputed fact must be outcome determinative. *See Hossman v. Spradlin,* 812 F.2d 1019, 1020–21 (7th Cir.1987). The court's inquiry is whether a reasonable fact finder could find by a preponderance of the evidence that the plaintiff is entitled to judgment. *Doe v. Allied–Signal, Inc.,* 925 F.2d 1007, 1008 (7th Cir.1991).

In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the nonmovant, and must resolve any doubt against the moving party. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). If a reasonable fact-finder could find for the opposing party, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992). Entry of summary judgment is mandatory when the requirements of Rule 56(c) are met. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989); *Spellman v. Commissioner,* 845 F.2d 148, 152 (7th Cir.1988).

The Seventh Circuit has noted that summary judgment is "infrequently an appropriate resolution" of a Title VII case because such cases often turn on issues of motive or intent. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989) (citing *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986)). However, even when discriminatory intent is at issue, summary judgment is appropriate when the nonmovant presents no evidence to indicate motive or intent in support of her position. *See Holland*, 883 F.2d at 1312. Further, the nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support. *Cliff v. Board of School Comm'rs*, 42 F.3d 403, 408 (7th Cir.1994). Nevertheless, courts are cautioned to apply the summary judgment standard with "added rigor in employment discrimination cases." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993); *Holland*, 883 F.2d at 1313 (emphasizing the need for using "special caution" when deciding summary judgment in a discrimination case).

### B. TITLE VII

By enacting Title VII, 42 U.S.C. § 2000e *et seq.*, Congress attempted to pass a law that would prevent the perpetuation of pernicious stereotypes, eliminate the degradation of persons who share certain protected characteristics, and thus open up employment opportunities to those persons. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3d Cir.1990). The underlying purpose of Title VII is to remove artificial, arbitrary and unnecessary barriers to employment when those barriers operate to discriminate on the basis of race, sex or other protected characteristics. *Id.* The Supreme Court has held that Title VII is violated when a woman is subjected to a hostile environment created by severe and pervasive harassment because of her sex. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). To successfully bring a sexual harassment claim under Title VII based on an alleged hostile environment a plaintiff must show that the defendant's, or its agent's, conduct was "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405; *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1043 (7th Cir.1994). Such a determination is not based on a "mathematically precise test," but instead is determined by looking at the totality of all the circumstances. *Hutchison*, 42 F.3d at 1043 (quoting *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

In *Harris*, the Supreme Court developed a non-exhaustive list of factors to be considered when determining whether a workplace has been rendered hostile or abusive. *Harris*, 114 S.Ct. at 371; *Dey v. Colt Const. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). Although all of the circumstances must be considered, courts are to pay particular attention to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, —— U.S. at ——, 114 S.Ct. at 371; *Dey*, 28 F.3d at 1453.

These factors must be evaluated from both a subjective and an objective perspective. *Dey*, 28 F.3d at 1454.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Id.* (quoting *Harris*, —— U.S. at ——, 114 S.Ct. at 370). Therefore, courts consider not only the actual effect of the conduct, but also the effect such conduct would have on a reasonable person in the plaintiff's position. *Id.* Relatively isolated incidents of non-severe misconduct will not suffice to support a claim of sexual harassment. *Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526, 533 (7th Cir.1993). But a series of

offensive statements or misconduct, if sufficiently severe and pervasive, could constitute an objectively hostile environment. *Dey,* 28 F.3d at 1456.

■■■■ The Seventh Circuit further refined the inquiry in a case that distinguishes between "merely vulgar" and "mildly offensive" conduct and conduct that is "deeply offensive" and "sexually harassing." *Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir.1995) (citing *Carr v. Allison Gas Turbine Div.,* 32 F.3d 1007, 1010 (7th Cir.1994)). The former is considered a "merely unpleasant working environment" while the latter constitutes a "hostile or deeply repugnant" one. Conduct that would fall in the latter category includes "sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures." *Baskerville,* 50 F.3d at 430. The former category would include the "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Id.*

■■■■ Title VII also prohibits an employer from discriminating against employees because they have opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e–3(a); *Dey,* 28 F.3d at 1457. The elements of a prima facie case establishing retaliation require a showing that:

1. plaintiff engaged in a legally protected activity;
2. employer subsequently took adverse employment action against plaintiff; and
3. employment action was *caused* by plaintiff's participation in protected activity (called by courts the "causal link").

*Rennie v. Dalton,* 3 F.3d 1100, 1109 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Weaver*

*v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1524 (7th Cir.1991); *Lloyd v. Bridgeport Brass Corp.,* 811 F.Supp. 401, 407 (S.D.Ind.1993).

■■■■ Once the employee makes a showing sufficient to prove a prima facie case of sexual harassment or retaliation, he or she will enjoy a rebuttable presumption of discrimination that shifts the burden of production to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action.[4] *Anderson,* 13 F.3d at 1122. The employer does so by producing evidence, whether or not persuasive, of a nondiscriminatory reason. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (noting that the plaintiff retains the ultimate burden of persuasion on the issue of intentional discrimination).

■■■■ If the employer succeeds in this task, the presumption dissolves and the burden of production shifts back to the plaintiff "to show that the employer's proffered reasons are a pretext for ... discrimination" or retaliation. *Anderson,* 13 F.3d at 1122 (citing *Weihaupt,* 874 F.2d at 426–27); *Lloyd,* 811 F.Supp. at 405. Absent direct evidence of discrimination or retaliation, the plaintiff can prove pretext by showing that, 1) the employer's stated reason has no basis in fact; 2) although based on fact, the stated reason was not the *real* reason; or 3) the stated reason was insufficient to warrant the adverse employment action. *Hughes,* 20 F.3d at 747; *Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1114 (7th Cir.1992); *Lloyd,* 811 F.Supp. at 405.

■■■■ To show pretext at the summary judgment stage, the plaintiff must produce sufficient evidence from which a rationale fact-finder could infer that the employer *lied* about its proffered reasons. *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995) (pretext does not mean mistake, "[i]t means a lie, specifically a phony reason for some action."); *Schultz v. General Elec. Cap. Corp.,* 37 F.3d 329, 334 (7th Cir.1994).

---

4. This indirect method of proof was first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dept. of Community Aff. v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center*

*v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The *McDonnell–Douglas* presumption is only a "procedural device" intended to establish an order of proof and production, not a means of deciding the merits. *Hicks,* 113 S.Ct. at 2755.

"There is a fine line between evidence that appropriately challenges the employer's proffered reasons as being unworthy of credence and evidence that merely shows that the employer made a mistake or a bad business judgment." *Schultz*, 37 F.3d at 334 (quoting *Kralman v. Illinois Dep't of Vet. Aff.*, 23 F.3d 150, 156 (7th Cir.1994)). Absent some showing of discriminatory motive, courts do not question an employer's good faith business decisions. *Id.*

### III. DISCUSSION

### A. SUMMARY OF ARGUMENTS

The parties' arguments essentially boil down to two issues. The first is whether all of the conduct that Sink describes as related to sexual harassment could be considered the type of conduct Title VII was meant to prohibit. Second is the issue of whether Sink's ultimate discharge resulted from any retaliatory or discriminatory motive on the part of Bailey.

### B. ANALYSIS

### 1. Sexual Harassment

■ Unquestionably, the three incidents of conduct of a sexual nature by Sink's co-worker—the joke and the personal questions during the ride home from the conference—do not rise to the necessary level of severity or pervasiveness on which to base a Title VII claim. *See Saxton*, 10 F.3d at 528–29; *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 336 (7th Cir.1993); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 211–12 (7th Cir.1986). Sink would have the Court look also to the rest of Warthan's conduct as evidence of harassment on the basis of sex in support of a finding of a hostile and abusive work environment. However, in order for that conduct to be considered sexual harassment, it would have to have occurred *because of* her sex. Sink has failed to point to sufficient evidence on which to make that determination.

In an effort to bolster her claim of hostile environment sexual harassment Sink alludes to Warthan's conduct that she describes as "gender-based hazing." She also cites the Court to three cases that allegedly support a finding that this subsequent conduct should be considered to be sexual harassment even though it is not sexual in nature. The oldest of the three, *McKinney v. Dole*, 765 F.2d 1129, 1131 (D.C.Cir.1985), was a case in which the trial court had ruled that Title VII was not violated by any conduct unless it was *quid pro quo* sexual harassment. In other words, the trial court refused to recognize a claim for sexual harassment based on a hostile environment. The Supreme Court's decision in *Meritor* resolved that issue, but the D.C.Circuit opinion foretold that result in *McKinney* and remanded the case for further consideration of a hostile environment claim.

It was in this context that the *McKinney* court stated that it had never held that sexual harassment, or other unequal treatment of an employee that occurs because of the employee's sex, must take the form of sexual advances or other instances with clearly sexual overtones. *McKinney*, at 1138–39. The precise holding in *McKinney*, then, is that "any harassment or other unequal treatment of an employee ... that would not occur but for the sex of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII." *Id.* This holding was then illustrated by an example of a *supervisor* who consistently used physical force toward an employee because of that employee's sex, noting that such conduct *may*, "if pervasive enough" form an illegal condition of employment. *Id.* The court also provided an example of a pattern of mixed sexual advances and physical force that would be actionable if based on the employee's sex.

Taking their cue from *McKinney*, the courts in *Hall v. Gus Construction Co., Inc.*, 842 F.2d 1010 (8th Cir.1988), and *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir. 1987), found conduct that was not overtly sexual in nature to be part of a pattern of sexual harassment. *Hall*, 842 F.2d at 1014; *Hicks*, 833 F.2d at 1415. These cases are inapposite, however, because both cases treated situations in which conduct occurred of both a sexual and non-sexual nature, but the evidence supported a clear connection between the two types of conduct.

In *Hall*, for example, three women construction workers sued their employer because they had been subjected to verbal and physical abuse by their co-workers. The abuse included unwelcome solicitations for sexual acts, calling the women sexually-suggestive names, touching their breasts and thighs, in addition to calling one woman "herpes" and urinating in her gas tank. The latter was the conduct at issue as not being of a sexual nature. *Hall*, 842 F.2d at 1013–14. In this context, the court had no trouble viewing that conduct, directed at only one of the women, as part of a pattern of sexual harassment, and finding that the conduct would not have occurred but for her sex.

*Hicks* was another case in which the trial court refused to recognize the hostile environment type of sexual harassment. *Hicks*, 833 F.2d at 1414. Therefore, the court had failed to consider the unwarranted touching and familiarities by her supervisor of which Hicks complained. On that basis the Tenth Circuit Court of Appeals remanded the case for the trial court to consider, in light of *Meritor*, whether a hostile environment existed. The *Hicks* court approved of the *McKinney* standard for what evidence should be considered in support of a sexual harassment claim. *Id.* at 1415. [5]

█ Using the "totality of the circumstances" test, this Court finds that the conduct about which Sink complains does not rise to the level of severe and pervasive sexual harassment that violates Title VII. Based on her own testimony and conduct, it is clear that Sink subjectively perceived her environment to be hostile and sexually harassing. The claimant's perception, however, is only part of the inquiry. The evidence does not support a finding that the environment to which Sink was subjected would be perceived as abusive by a reasonable person in her position. Instead, the evidence supports a finding that the environment was

merely unpleasant rather than hostile and deeply repugnant. *See Baskerville*, 50 F.3d at 430. Sink fails to point to sufficient evidence to support a reasonable conclusion that Warthan, as a spurned suitor, proceeded on a campaign of criticism, tattling and bickering against her because of her sex. Consequently, that conduct does not cumulate in a totality of the circumstances test to support a finding of sexual harassment. [6]

█ Even if it did, ample evidence has been presented to indicate that once the Hospital knew of Warthan's conduct and had a reasonable opportunity to investigate the complaints, it took adequate remedial actions. Warthan was reprimanded, his office was moved, he was instructed on the topic of sexual harassment, and Sink's future contact with him was minimized. By Sink's own testimony and her note to Demas, the resolution of the problem was satisfactory to her. The law does not require an employer to do more than take reasonable steps to discover and rectify acts of sexual harassment. *Baskerville*, 50 F.3d at 432. What is reasonable depends on the gravity of the harassment. *Id.* Because no further acts of harassment occurred after Sink complained to the Hospital, the Court is entitled to infer that the steps taken were reasonable and adequate.

### 2. Retaliation

█ Sink's retaliation claim cannot be resolved on summary judgment. Sink has alleged, and Bailey has not entirely denied, that certain statements were made by Bailey to Sink after Sink complained to the Hospital's Human Resources Department and after she filed her EEOC charge. Specifically, Sink alleges that Bailey admonished her for "going across the street" with her complaints about Warthan's conduct, referring to Sink having complained to the Human Resources Department. Bailey also told Sink her job was in danger if she did not stop talking

---

5. On remand the trial court found that Hicks had not been subjected to a hostile environment and the Tenth Circuit affirmed that finding on appeal. *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 972 (10th Cir.1991).

6. A constant theme throughout the entire period during which Sink alleges she was sexually ha-

rassed is that Sink was not performing her job adequately. *See* Bailey Dep. at 144–48 (charts not completed and in wrong place); Bailey Dep. at 154–57, Plf's Ex. 9 (patient letter complaining about Sink); Bailey Dep. at 55–69, Vanderbeck Dep. at 33–34, Demas Dep. at 40 (Sink failure to complete assignment and misrepresenting same).

about the harassment issue. Sink was also criticized by Bailey for filing a complaint against Warthan with the state credentialling agency. These comments could be seen as revealing a discriminatory animus toward Sink because she exercised her protected right to complain about an alleged violation of Title VII.

■ Bailey was one of the decision-makers involved in determining whether Sink's employment should be terminated, the other one being Dr. Vanderbeck. In fact, Bailey was the supervisor who had the most contact with Sink and the one who informed her of the decision to terminate her employment. If a supervisor with discriminatory animus is involved with the adverse employment action, it taints the validity of that action. *Dey v. Colt Const.*, 28 F.3d at 1459. "Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Id.*

What was actually said by Bailey, whether it indicates a discriminatory motive for Sink's termination, and how large a part Bailey's motivations played in the decision are all factual issues that depend on the credibility of the two witnesses, Bailey and Sink. As such, it is a determination that should be made by the trier of fact, not this Court on a summary judgment motion. If Sink's version of Bailey's conduct is believed, it would appear that Bailey harbored ill feelings towards Sink and was looking for a reason to terminate her employment. If Bailey is believed, then it would appear that Sink was a gossip and a trouble-maker, who was more interested in creating controversy than resolving it, and her employer was justified in firing her.

### III. CONCLUSION

This Court has been shown insufficient evidence from which to find a factual dispute over whether Sink was subjected to a hostile environment and from which to find that the Hospital's response to her complaints was inadequate. Consequently, summary judgment in favor of the Hospital is proper on Sink's claim of sexual harassment, and is therefore GRANTED. However, a genuine issue of material fact exists as to whether Bailey, a supervisor with considerable input into the decision to discharge Sink, harbored a retaliatory motive that substantially influenced that action. Consequently, summary judgment in favor of the Hospital on Sink's retaliation claim would be improper, and is therefore DENIED.

IT IS SO ORDERED.