Valerie A. **BASKERVILLE,**
Plaintiff–Appellee,

v.

**CULLIGAN INTERNATIONAL COMPANY, Defendant–Appellant.**

No. 94–2837.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1995.

Decided March 20, 1995.

Ronald A. Orner, Norton Wasserman (argued), Mary A. Mazurk, James Bartlett, Orner & Wasserman, Chicago, IL, for plaintiff-appellee.

Edward C. Jepson, Jr. (argued), Carlys E. Belmont, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.

POSNER, Chief Judge.

A jury awarded Valerie Baskerville $25,000 in damages under Title VII of the Civil Rights Act of 1964, as amended, for sexual harassment by her employer, Culligan International Company. Although reluctant to upset a jury verdict challenged only for resting on insufficient evidence, we have concluded that the facts, even when construed as favorably to the plaintiff as the record permits, do not establish a case of actionable sexual harassment.

Baskerville was hired on July 9, 1991, as a secretary in the marketing department of Culligan, a manufacturer of products for treating water. A month later she was assigned to work for Michael Hall, the newly hired Western Regional Manager. Baskerville testified, we assume truthfully, to the following acts of sexual harassment of her by Hall between the date of his hire and February 1992, a period of seven months:

1. He would call her "pretty girl," as in "There's always a pretty girl giving me something to sign off on."

2. Once, when she was wearing a leather skirt, he made a grunting sound that sounded like "um um um" as she turned to leave his office.

3. Once when she commented on how hot his office was, he raised his eyebrows and said, "Not until you stepped your foot in here."

4. Once when the announcement "May I have your attention, please" was broadcast over the public-address system, Hall stopped at Baskerville's desk and said, "You know what that means, don't you? All pretty girls run around naked."

5. He once called Baskerville a "tilly," explaining that he uses the term for all women.

6. He once told her that his wife had told him he had "better clean up my act" and "better think of you as Ms. Anita Hill."

7. When asked by Baskerville why he had left the office Christmas Party early, Hall replied that there were so many pretty girls there that he "didn't want to lose control, so I thought I'd better leave."

8. Once when she complained that his office was "smokey" from cigarette smoke, Hall replied, "Oh really? Were we dancing, like in a nightclub?"

9. When she asked him whether he had gotten his wife a Valentine's Day card, he responded that he had not but he should because it was lonely in his hotel room (his wife had not yet moved to Chicago) and all he had for company was his pillow. Then Hall looked ostentatiously at his hand. The gesture was intended to suggest masturbation.

We do not think that these incidents, spread over seven months, could reasonably be thought to add up to sexual harassment. The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women. (Sexual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases.) It is not designed to purge the workplace of vulgarity. Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986); *Harris v. Forklift Systems, Inc.*, — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1009–10 (7th Cir. 1994). On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. *Meritor Savings Bank v. Vinson, supra*, 477 U.S. at 61,

106 S.Ct. at 2402–03; *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620–21 (6th Cir. 1986); *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983). We spoke in *Carr* of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing." 32 F.3d at 1010. It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other; and when it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error. Our case is not within the area of uncertainty. Mr. Hall, whatever his qualities as a sales manager, is not a man of refinement; but neither is he a sexual harasser.

■ He never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on primetime television. The comment about Anita Hill was the opposite of solicitation, the implication being that he would get into trouble if he didn't keep his distance. The use of the word "tilly" (an Irish word for something added for good measure, and a World War II British slang term for a truck) to refer to a woman is apparently an innovation of Hall's, and its point remains entirely obscure. Some of his repartée, such as, "Not until you stepped your foot in here," or, "Were we dancing, like in a nightclub?," has the sexual charge of an Abbott and Costello movie. The reference to masturbation completes the impression of a man whose sense of humor took final shape in adolescence. It is no doubt distasteful to a sensitive woman to have such a silly man as one's boss, but only a woman of Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity—would find Hall's patter substantially more distressing than the heat and cigarette smoke of which the plaintiff does not complain. The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely

to have so great an emotional impact as a concentrated or incessant barrage. *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1456 (7th Cir.1994); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 444 and n. 3 (7th Cir.1994).

We are mindful of the dangers that lurk in trying to assess the impact of words without taking account of gesture, inflection, the physical propinquity of speaker and hearer, the presence or absence of other persons, and other aspects of context. Remarks innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room. So too remarks accompanied by threatening gestures or contorted facial features, or delivered from so short a distance from the listener's face as to invade the listener's private space. Cf. Erving Goffman, *The Presentation of Self in Everyday Life* (1959). Even a gross disparity in size between speaker and listener, favoring the former, might ominously magnify the impact of the speaker's words.

It is a little difficult to imagine a context that would render Hall's sallies threatening or otherwise deeply disturbing. But we need not test the breadth of our imagination. Hall and Baskerville were never alone outside the office, and there is no suggestion of any other contextual feature of their conversations that might make Hall a harasser. We conclude that no reasonable jury could find that Hall's remarks created a hostile working environment.

■ But even if we are wrong, and Hall's remarks could reasonably be thought to cross the line that separates vulgarity (not actionable) from harassment (potentially actionable), the plaintiff must lose because the company took all reasonable steps to protect her from Hall. An employer is not strictly liable for sexual harassment of one worker by another unless, perhaps, the harassment takes the form, not here alleged, of an abuse of authority, as where a supervisor threatens to fire a subordinate if she refuses to have sex with him. In such cases, a number of courts treat the supervisor *as* the employer, e.g., *Bouton v. BMW of North America, Inc.,*

29 F.3d 103, 106–07 (3d Cir.1994); *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 185–86 (6th Cir.1992); see also *Karibian v. Columbia University,* 14 F.3d 773, 780 (2d Cir. 1994), whether correctly or not we need not decide. (Neither the Supreme Court nor our court has had occasion to decide the question.) In all other cases, it is clear, the criterion for when an employer is liable for sexual harassment is negligence, just as under the old common law of industrial accidents. *Meritor Savings Bank v. Vinson, supra,* 477 U.S. at 71, 106 S.Ct. at 2407–08; *Carr v. Allison Gas Turbine Division, supra,* 32 F.3d at 1009; *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535 (7th Cir.1993); *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990). The employer's legal duty is thus discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees.

Here we add that what is reasonable depends on the gravity of the harassment. Just as in conventional tort law a potential injurer is required to take more care, other things being equal, to prevent catastrophic accidents than to prevent minor ones, *Gottschall v. Consolidated Rail· Corp.,* 988 F.2d 355, 375 (3d Cir.1993); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, p. 208 (5th ed. 1984), so an employer is required to take more care, other things being equal, to protect its female employees from serious sexual harassment than to protect them from trivial harassment. *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir.1991); *Dornhecker v. Malibu Grand Prix Corp.,* 828 F.2d 307, 309 (5th Cir.1987). Had Hall assaulted Baskerville, due care might have required the company to fire him on the· spot. He did not assault her. The first the company learned of his shenanigans was in November 1991, three or four months after they had begun, when Baskerville complained to Hall's supervisor. She mentioned only three incidents. The supervisor spoke to Hall about the complaint forthwith, apparently with some acerbity, because Hall reported to Baskerville that his supervisor had taken a big bite out of his behind. It is true that the incidents continued. But in complaining to Hall's supervisor, Baskerville had not been going through proper channels. The compa-

ny's policy on sexual harassment, as she admitted knowing, requires that complaints of sexual harassment be made to the company's human resources department. She did not complain to the department until February 1992. The matter was promptly investigated, and both the director of the department, and Hall's immediate supervisor, told him that his offensive behavior must cease immediately. He was also placed on probation and a salary increase was held up for several months. He got the point. He ceased the offensive behavior immediately, and there was no recurrence. Had Baskerville complained to the human resources department earlier, as she had been instructed to do, there is no reason to doubt that the "harassment," if as we doubt that is the proper word, would have ceased then.

So, just as in *Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794 (5th Cir.1994) (per curiam), the employer took "prompt and appropriate remedial action." See also *Ellison v. Brady, supra,* 924 F.2d at 881–82, and cases cited there. No more was required—indeed nothing was required, if as we believe (it is the alternative ground for our decision) Hall's behavior did not even reach the threshold at which it could reasonably be thought to create a hostile working environment for the plaintiff. We need not consider what additional efforts the company would have been required to take, on pain of legal sanction, had the plaintiff complained about real harassment. There are plenty of cases of ineffectual responses to serious charges. E.g., *Carr v. Allison Gas Turbine Division, supra,* 32 F.3d at 1012; *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1464 (9th Cir. 1994); *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264 (8th Cir.1993). The test is reasonableness, and reasonableness, as we have said, depends among other things on the gravity of the harassment alleged. No one would think it rational to spend more money investigating a traffic offense than a murder or to punish the traffic offender more heavily. We are baffled by the statement in a footnote in *Ellison v. Brady, supra,* 924 F.2d at 882 n. 17, rejecting our holding in *Brooms v. Regal Tube Co.,* 881 F.2d 412, 421 (7th Cir.1989), that the test is "what a rea-

sonable employer would do to remedy the sexual harassment." Apparently the author of the footnote thought we might consider it "reasonable" for an employer simply to ignore charges of sexual harassment if for example they were made against a highly valued employee. That is like saying it might be reasonable for an automobile driver to drive without regard to the hazards to pedestrians because he was in a hurry. Both the driver in relation to pedestrians and the employer in relation to employees victimized by coworkers' sexual harassment have legal duties of care, and the reasonableness of their conduct is assessed in relation to that duty.

The judgment for the plaintiff is reversed with instructions to enter judgment for the defendant.

REVERSED.