Aldene KANNENBERG, Plaintiff-Appellant,†

v.

LABOR & INDUSTRY REVIEW COMMISSION and Walker Stainless Equipment Company, Defendants-Respondents.

Court of Appeals

*No. 97–0224. Submitted on briefs July 9, 1997.—Decided September 18, 1997.*

(Also reported in 571 N.W.2d 165.)

†Petition to review denied.

<br>

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Linda L. Harfst* of *Cullen, Weston, Pines & Bach.*

On behalf of the defendant-respondent, Labor and Industry Review Commission, the cause was submitted on the brief of *James E. Doyle, attorney general,* and *Karen E. Timberlake, asst. attorney general.*

On behalf of the defendant-respondent, Walker Stainless Equipment Company, the cause was submitted on the brief of *William T. Curran* of *Curran, Hollenbeck & Orton, S.C.*

Before Eich, C.J., Vergeront and Deininger, JJ.

VERGERONT, J.   Aldene Kannenberg appeals the affirmance of a decision of the Labor and Industry Review Commission (LIRC) finding that she was not sexually harassed in her employment within the meaning of § 111.36(1)(b) and (br), STATS., and § 111.32(13), STATS.,[1] and was not subjected to retaliation as prohib-

---

[1] Section 111.36, STATS., provides in part:

    (b) Engaging in sexual harassment; or implicitly or explicitly making or permitting acquiescence in or submission to sexual harassment a term or condition of employment; or making or permitting acquiescence in, submission to or rejection of sexual harassment the basis or any part of the basis for any employment decision affecting an employe, other than an employment decision that is disciplinary action against an employe for engaging in sexual harassment in violation of this paragraph; or permitting sexual harassment to have the purpose or effect of substantially interfering with an employe's work performance or of creating an intimidating, hostile or offensive work environment. Under this paragraph, substantial interference with an employe's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the employe would

ited by § 111.322(3), STATS.[2] She contends that LIRC erred in the legal standards it applied to determine whether there was sexual harassment and that the evidence shows that she was subject to sexual harass-

consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.

(br) Engaging in harassment that consists of unwelcome verbal or physical conduct directed at another individual because of that individual's gender, other than the conduct described in par. (b), and that has the purpose or effect of creating an intimidating, hostile or offensive work environment or has the purpose or effect of substantially interfering with that individual's work performance. Under this paragraph, substantial interference with an employe's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the employe would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.

Section 111.32(13), STATS., provides:

"Sexual harassment" means unwelcome sexual advances, unwelcome requests for sexual favors, unwelcome physical contact of a sexual nature or unwelcome verbal or physical conduct of a sexual nature. "Sexual harassment" includes conduct directed by a person at another person of the same or opposite gender. "Unwelcome verbal or physical conduct of a sexual nature" includes but is not limited to the deliberate, repeated making of unsolicited gestures or comments of a sexual nature; the deliberate, repeated display of offensive sexually graphic materials which is not necessary for business purposes; or deliberate verbal or physical conduct of a sexual nature, whether or not repeated, that is sufficiently severe to interfere substantially with an employe's work performance or to create an intimidating, hostile or offensive work environment.

[2] Section 111.322(3), STATS., provides:

To discharge or otherwise discriminate against any individual because he or she has opposed any discriminatory practice under this subchapter or because he or she has made a complaint, testified or assisted in any proceeding under this subchapter.

ment and retaliation. We conclude that LIRC applied the correct legal standards on the sexual harassment claim, and that its decision on that claim is supported by substantial evidence in the record and is a reasonable application of the law. We therefore affirm.

## BACKGROUND

Kannenberg began work on January 2, 1991, at Walker Stainless Equipment Company in New Lisbon, Wisconsin, as a second-shift tool room attendant in the transportation division. She was the only woman working among 20–25 men on the second shift. Kannenberg's complaints to Walker personnel about behavior she considered sexually harassing began in mid-February 1993. She filed a complaint with LIRC's Equal Rights Division (ERD) in November 1993.[3] While the complaint was being investigated, Kannenberg was disciplined for discourteous behavior to a supplier and she filed a complaint for retaliation as a result of that discipline. The ERD issued determinations of probable cause on both complaints in the summer of 1994. Kannenberg filed a third complaint based on incidents that occurred in the fall of 1994. Rather than have the ERD conduct an investigation of the third complaint, the parties agreed to have the allegations of that complaint heard at the hearing already scheduled on the first two complaints.

Following the hearing, the ERD issued a decision determining that Walker did not discriminate against Kannenberg, did not engage in sexual harassment, and did not retaliate. LIRC agreed with the ERD decision

---

[3] This complaint alleged discrimination based on age and sex, but the initial determination on the age complaint was that there was no probable cause with respect to age discrimination. The age issue is not involved in this appeal.

377

and adopted the examiner's findings and conclusions as its own, after modifying one finding. LIRC's findings of fact, as modified, are as follows.

Kannenberg's primary responsibility was to issue tools and parts stored in the tool room to the employees who were assembling the equipment. The company's rule was that when employees wanted a tool, they had to fill out a requisition slip and the tool room attendant would then get the tool. However, before Kannenberg's employment, the employees and the tool room attendant followed these rules only loosely. Shortly after she was hired, one of Kannenberg's supervisors told her he wanted her to strictly enforce the rules. At the time Kannenberg was hired, pictures of nude and scantily clad women had been commonly displayed around the workplace, including the tool room. After she was hired, however, Walker's management instructed the pinups in the tool room be taken down, and they were. Male employees still kept pinups on the inside of their tool boxes, which were about waist high and had cupboard type doors.

In mid-February of 1993, while on break in the lunchroom, Kannenberg found a photograph of a man and woman having sexual intercourse. She complained to her immediate supervisor, Tom Baldwin, who gave the photo back to her without saying anything. She complained the next day to the shop supervisor, Kevin Klinker. Klinker spoke with other employees about the photo and concluded that it had not been left for the purpose of offending her but had been passed around among employees during the first shift and simply left on the lunchroom table.

Later that month Kannenberg complained to Klinker about pinups of naked women that were taped inside the doors of an open tool box belonging to

another employee, Reisenhauer, because she believed the pictures were purposely being displayed to offend her. Klinker spoke with the employee and ascertained that the pictures were not being displayed to deliberately offend Kannenberg. Walker's management responded by ordering employees to keep their tool boxes closed if they contained pinup pictures. On March 12, 1993, management posted a directive on the bulletin board next to the time clock that all employees were to immediately remove sexually oriented pictures, jokes and similar items from the premises. Management personnel orally publicized the directive as they went through the plant to see if the directive was being followed. Compliance with the directive was good, and Kannenberg did not again complain about seeing such items at work.

The male employees commonly spoke foul language in the plant and although management asked them to watch their language when they were around the tool room out of consideration for Kannenberg, she overheard foul language from time to time. At no time, however, did any employee address foul language to Kannenberg or call her by a vulgar or obscene name. During the summer of 1993 these three incidents occurred, the first of which Kannenberg reported to management: (1) two coworkers, McCullough and Reisenhauer, yelled "fuck you" to each other in front of Kannenberg with the intention of provoking her, although the epithets were not directed at her; (2) she heard McCullough shout "oh fuck" near her, and believed that the expletive was intended to offend her, although the circumstances indicated the employee was not intending to address her; and (3) one coworker pulled at another's trousers when Kannenberg was retrieving some tools for them; when she returned, the

second coworker, with his back to her, was hitching up his trousers and saying, "I wonder if this could be considered sexual harassment."

That same summer approximately four obscene drawings or words appeared on the cardboard covers of the requisition pads kept at the gate to the tool room including: (1) A cartoon of a mouse with a human phallus and the words "here, pussy pussy"; (2) a cartoon of a man, penis showing, wearing a mask, and labeled "southy"; (3) the words "wanna see my penis"; and (4) a drawing of a penis. None of the drawings or words were specifically directed at Kannenberg. Through her attorney, Kannenberg provided copies of these drawings to Walker's management in August of 1993. Management questioned several employees about the items, including the one employee who Kannenberg suspected of making one of the drawings. Everyone questioned denied knowledge of the drawings. The suspected employee left employment with Walker soon after. There were no more obscene drawings or words on the requisition pad after that time.

On another occasion that summer, Kannenberg became upset by her coworkers' practice of cutting out pieces of the cardboard covers of requisition pads for tool chips. She wrote a message on one of the covers which said: "Do not use this cardboard for chips." Kannenberg received three written responses on the cardboard which stated: "OK, thanks," "Yes I will and don't forget it," and "OK Bitch!" Copies of these responses were furnished to Walker's management in August of 1993, but none of the authors were uncovered during an investigation into the incident.

In August of 1993, McCullough lost his temper and pounded his fist on the counter when Kannenberg told him he had to have a tool chip to check out a tool.

Klinker and Joann Bateson, Walker Human Resources Director, spoke to both employees in an effort to mediate the dispute. McCullough stated that Kannenberg was not evenhanded in enforcing the tool room procedures and had favorites. At the conclusion of this meeting, Bateson told them to be civil to each other and shake hands. McCullough was willing to do so but Kannenberg was not.

Kannenberg's performance evaluations in March 1991, January 1992, and February 1993 indicate that she was generally a productive employee, but had some difficulties cooperating and working with fellow employees. At various times, either through complaints of Kannenberg or complaints of other employees, Walker management formed the opinion that Kannenberg was impolite and argumentative with other employees. This opinion was not based on Kannenberg's sex.

In the spring of 1994, Kannenberg received a written warning following a complaint from a sales representative of a supplier that she had been rude to him during an after-hours delivery. The issuance of this warning was motivated by Klinker's understanding of the incident based on the account given to him by an employee to whom the sales representative spoke. Kannenberg's 1994 evaluation, completed after this incident, again gave Kannenberg her lowest grade in the category of "working relationships." This was based on Klinker's understanding of the various run-ins Kannenberg had with others. Neither the written warning nor the evaluation was in retaliation for the complaint Kannenberg had filed or because of her sex.

Kannenberg reported three incidents to Klinker which occurred, respectively, in July 1994, September 1994 and October 1994. In the first incident, an

employee who came to order a tool had masking tape on his pants from his crotch to his belt and, at one point, he grabbed his crotch. Nothing was said between them about the tape. Kannenberg felt the tape was put on to offend her. Klinker questioned the employee, who said he had put the tape on to cover up some rips. Klinker concluded the employee had not intended to offend Kannenberg. In the second incident, Kannenberg noticed a handwritten advertisement taped to a tool box with wording changed from "free dog" to "free dong," and believed this was intended to offend her. Klinker questioned employees and concluded that the letter "n" was added by someone on the first shift and was therefore not intended to offend Kannenberg. In the third incident, Kannenberg returned from work after a day of vacation and found a note in the tool room that read: "Thanks AK, we had a good night Friday. Take more vac. Night Shift." Klinker investigated and Baldwin admitted writing the note. At first the company gave Baldwin a written warning but then terminated him for writing the note. This was the last incident covered by the complaints.

LIRC concluded that Kannenberg had not established by a preponderance of the evidence that Walker had retaliated against her, engaged in discrimination based on sex or engaged in sexual harassment, or permitted sexual harassment to have the purpose or effect of substantially interfering with Kannenberg's work performance or creating a hostile or offensive work environment. In the ERD memorandum opinion, the hearing examiner explained how he reached the conclusions regarding sexual harassment. Citing federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2 (1997), including *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986), the examiner

noted that the test is whether the incidents are sufficiently severe and pervasive to alter the complainant's working conditions and create a hostile work environment. The examiner stated that the totality of the circumstances must be considered as well as the cumulative effect of all the incidents. He also noted that courts have considered these factors in deciding whether there is sexual harassment: the frequency of the conduct; the degree to which it is sexually graphic as opposed to merely vulgar; the degree to which the conduct is directed at the complainant; the extent to which any sexually oriented material complained of is on display and the length of time; and the number of sources from which the conduct originates.

The examiner stated that this was a "close case" because some of the drawings would be very offensive to one in Kannenberg's position; the photos and drawings she saw were sexually oriented and graphic and came from more than one source; and, on at least one occasion, she was directly addressed as "bitch." On the other hand, the hearing examiner considered that, with regard to the photos, there were only three occasions over a twenty-month period, and they were not visible for an extended period of time. The vulgar language, with one exception, was not intended to offend Kannenberg, and, with the exception of the "bitch" writing, she was not addressed in a demeaning manner. The drawings on the requisition pad did not depict her nor were they directed at her. They had limited effect throughout the plant because she had control over the pad.

The examiner analyzed each of the sixteen incidents that Kannenberg alleged over a period of twenty months. He considered that some were not sexual harassment or were not at all serious, and some were

383

outgrowths of personality differences and not attributable to sexual attitudes. He considered the drawings on the requisition pad, the "bitch" note and the exchange of obscenities staged for Kannenberg's hearing to be serious incidents. Considering the number and severity of the incidents, their duration, and the degree to which they were directed at Kannenberg, the examiner concluded the offensive behavior was isolated and sporadic, rather than pervasive and severe.

## STANDARD OF REVIEW

Kannenberg contends that LIRC erred in the legal standard it used to determine what creates a hostile work environment; in the application of the totality of the circumstances test; in its interpretation of the motive requirement; and in failing to take into account the statutory directive of the Wisconsin Fair Employment Act (WFEA) that its provisions are to be liberally construed. Kannenberg also contends that LIRC erred in determining that she was not subject to sexual harassment and retaliation.

In reviewing LIRC's decisions,[4] we may not substitute our judgment for that of LIRC as to the weight of the evidence. *See* § 227.57(6), STATS. Instead, we determine whether the findings of fact are supported by substantial evidence, and if they are, we may not set them aside. *See id.* Whether LIRC properly interpreted the statute is a question of law and we are not bound by the agency's interpretation. *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57, 61 (1996). However, we

---

[4] We review the decisions of LIRC, not that of the circuit court. *Bunker v. LIRC*, 197 Wis. 2d 606, 611, 541 N.W.2d 168, 170 (Ct. App. 1995).

defer to the agency's interpretation of a statute in certain situations. *Id.* We give great weight when:

> (1) the agency was charged by the legislature with the duty of administering the statue; (2) . . . the interpretation of the agency is one of long-standing; (3) . . . the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) . . . the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Id.* We also give great weight to an agency's interpretation if it is intertwined with factual determinations or with value or policy determinations. *Bernhardt v. LIRC*, 207 Wis. 2d 294, 305, 558 N.W.2d 874, 878 (Ct. App. 1996). We give a lesser amount of deference—due weight—when the agency has some experience in the area but has not developed the expertise that necessarily places it in a better position than the court to make judgments regarding the interpretation of the statute. *UFE*, 201 Wis. 2d at 286, 548 N.W.2d at 62.

Under the great weight standard, we uphold an agency's reasonable interpretation of the statute if it is not contrary to the clear meaning of the statute, even if we conclude another interpretation is more reasonable. *UFE*, 201 Wis. 2d at 287, 548 N.W.2d at 62–63. However, under the due weight standard, we uphold the agency's reasonable interpretation if it comports with the purpose of the statute and we conclude there is not a more reasonable interpretation. *Id.*

Kannenberg argues that we should give no weight to LIRC's interpretation of the statute, employing a de novo standard of review. This is the standard of review appropriate when the issue before the agency is one of first impression or the agency's position has been so

inconsistent as to provide no real guidance. *UFE*, 201 Wis. 2d at 285, 548 N.W.2d at 262. LIRC responds that we should give great weight to its interpretation of the statute. We agree with LIRC.

LIRC is charged with adjudicating appeals from the hearing examiner's decision on complaints under the WFEA, § 111.39(5), STATS., which includes complaints under § 111.36, STATS., for sexual harassment. Discrimination based on sex under the WFEA has included sexual harassment since at least 1981.[5] LIRC has developed experience and expertise in deciding claims of sexual harassment under the WFEA, using the standards from federal cases decided under Title VII. *See, e.g., Olson v. Servpro of Beloit* (LIRC Aug. 4, 1995); *Roden v. Federal Express* (LIRC, June 30, 1993). By according great deference to LIRC's determinations of whether sexual harassment occurred, we will promote greater uniformity and consistency than if we did not do so.

Whether particular conduct constitutes sexual harassment as defined in the statute is intertwined with factual determinations. It also involves value and policy judgments about what conduct is and is not acceptable in the workplace. In these respects, the nature of the determination of sexual harassment is similar to that of misconduct under the unemployment compensation statute, *see* § 108.04(5), STATS., a statute under which LIRC is also charged with adjudicating claims. We have held that LIRC's decisions on whether misconduct has occurred are entitled to great weight

---

[5] The current versions of §§ 111.32(13) and 111.36(1)(b) and (br), STATS., were enacted by 1993 Wis. Act 427. The prior versions of § 111.32(13) and 111.36(1)(b) did define and prohibit sexual harassment. They were enacted by 1981 Wis. Act 334, §§ 9, 22.

because they are intertwined with fact and value determinations. *Bernhardt*, 207 Wis. 2d at 305, 558 N.W.2d at 878. For all these reasons, we conclude that LIRC's interpretation of the statute defining and prohibiting sexual harassment is entitled to great deference.

## DISCUSSION

Sexual harassment includes "unwelcome verbal or physical conduct directed at another individual because of that individual's gender" that has "the purpose or effect of creating an intimidating, hostile, or offensive work environment." Section 111.36(1)(br), STATS. Such an environment is established "when the conduct is such that a reasonable person under the same circumstances would consider the conduct sufficiently severe or pervasive to create such an environment." *Id.*

The first error Kannenberg alleges is that LIRC used the wrong standard in determining what constitutes a hostile work environment. Kannenberg agrees with LIRC that it appropriately looked to federal law for guidance in interpreting § 111.36(1)(b) and (br), STATS. *See Marten Transport, Ltd. v DILHR*, 176 Wis. 2d 1012, 1020, 501 N.W.2d 391, 394 (1993) (given the identical purposes of WFEA and Title VII, it is appropriate to consider federal decisions). However, she argues that LIRC incorrectly used the higher standard employed in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995), rather than the standard established in *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986), and *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Since neither the hearing examiner's decision nor LIRC's decision mention *Baskerville*, we understand Kannenberg's contention to be that, although the challenged decisions do not mention *Bas-*

*kerville*, the higher standard of that case was, in fact, employed in deciding that the conduct here did not constitute sexual harassment. We do not agree with Kannenberg's reading of *Baskerville*. We conclude that the court in *Baskerville* employed the *Meritor/Harris* standard and that LIRC employed the *Meritor/Harris* standard.

*Meritor* established that a claim for "hostile environment" sexual harassment was actionable under Title VII if it was "sufficiently severe or pervasive 'to alter the conditions of [the victims'] employment and create an abusive working environment' " *Meritor*, 477 U.S. at 67. In *Harris*, the Court addressed the question whether, to be actionable, the conduct had to seriously affect the complainant's well-being or lead the complainant to "suffer injury." *Harris*, 510 U.S. at 21. In concluding that such a showing was not necessary, the court reaffirmed the standard established in *Meritor*, *id.* at 23, and elaborated on it. The Court held that when determining whether an environment is hostile or abusive, all circumstances must be considered, and these may include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id.* at 22.

In *Baskerville*, the Seventh Circuit wrote of the difficulty "in drawing the line" between conduct that is sexual harassment and conduct that is not. *Baskerville*, 50 F.2d at 430. It described one side of the line as "sexual assaults, other physical contact, whether amorous or hostile for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures," and cited *Meritor* and *Harris*, among

other cases for this category. *Id.* The court described the other side of the line as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," citing *Meritor* and other cases. *Id.* The court in *Baskerville* concluded that the offensive comments of the complainant's boss were not sufficiently frequent or severe to cross the line from vulgarity to harassment. *Id.* at 431.

In support of her argument that *Baskerville* employs a more rigorous standard than *Meritor* and *Harris*, Kannenberg focuses on the court's statement that the prohibition of sexual harassment "is designed to protect working women [and men] from the kind of male [and female] attentions that can make the workplace hellish."[6] *Baskerville*, 50 F.2d at 430. A "hellish" workplace, Kannenberg contends, is worse than that which *Meritor* and *Harris* require. We conclude that the court in *Baskerville* uses "hellish" as shorthand for a hostile work environment as defined in *Meritor*, *Harris*, and other cases following them, and contrasts that with "vulgar conduct [which the prohibition against sexual harassment] is not designed to purge [from] the workplace." *Id.* The *Baskerville* court is not deviating from the standard of hostile environment established in *Meritor* and *Harris*.

LIRC employed the standard established in *Meritor*—sufficiently severe or pervasive to alter the conditions of the victim's employment—and reaffirmed in *Harris*. At bottom, we view Kannenberg's objection on this point as an objection to LIRC's conclusion that

---

[6] The full paragraph makes clear the court in *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995), is not intending to exclude the possibility that sexual harassment consists of conduct by women toward men or men toward other men or women toward other women.

the conduct complained of did not meet the *Meritor/Harris* standard, and we address that objection later in this opinion.

Kannenberg next argues that LIRC did not apply the "totality of the circumstances" test correctly but instead improperly considered each incident in isolation. We disagree and conclude that LIRC correctly stated and applied this test as developed in federal case law. Again, we consider the core of Kannenberg's objection here to be to the result LIRC reached after applying this test to the evidence.

The examiner's decision, adopted by LIRC, correctly states that under *Meritor* the "totality of the circumstances" must be considered in deciding whether the work environment would reasonably be perceived as hostile. *See Meritor*, 477 U.S. at 69. The decision also correctly stated that the cumulative effects of all the incidents alleged must be considered. *See* 29 CRF § 1604.11(6) (1996), *id.* Finally, the decision accurately listed the factors that federal courts have considered in similar cases in determining whether all the incidents alleged constitute evidence of a hostile work environment. *See, e.g., Harris*, 510 U.S. at 21; *Alvey v. Rayovac Corp.*, 922 F. Supp. 1315, 1330 (W.D. Wis. 1996).

In considering all the relevant circumstances, it is necessary to analyze the nature of each incident with reference to such factors as severity, sexually graphic nature, who it is directed at, source, duration, and so on. Kannenberg is correct that the incidents must not be viewed in a "vacuum," because "what may appear to be legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other incidents." *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.

1990). In addition, the incidents must be viewed together because frequency is one of the relevant considerations. *See Harris*, 510 U.S. at 21. The examiner analyzed the nature of each of the incidents, applying the stated relevant factors, considered them in context, and considered the frequency of the incidents. The examiner expressly considered "the totality" of all the circumstances in determining that the instances of sexual harassment were "isolated and sporadic," rather than "pervasive and severe," as required to establish a hostile work environment. *See Meritor*, 477 U.S. at 67.

Kannenberg argues that LIRC also deviated from established federal case law with respect to the assessment of the other employees' motives. She points to the examiner's evaluation of the incident in which McCullough lost his temper when Kannenberg asked him for a tool chip and of the incident of Baldwin's sarcastic note urging her to take more vacation time. The examiner determined that these two incidents demonstrated these employees' hostility toward Kannenberg but the hostility was "not shown to be based on her sex." Rather, the examiner stated, "[t]here was considerable evidence of arguments between Kannenberg and several other employees that were rooted in personality differences, not sexual attitudes. There was ample support in the evidence to conclude that Kannenberg was accurately cited by Walker for being worse than average at cooperating with her coworkers." Kannenberg argues that although the motives of the other employees is a question of fact, the examiner applied an incorrect legal principle. She relies on *Zabkowicz v. West Bend*, 589 F. Supp. 780, 784 (E.D. Wis. 1984), which rejected the employer's argument that no sexual harassment occurred because, given the complainant's personality, Zabkowicz would have "suffered equally

391

brutal harassment, even if in a different form," had she been a male. However, a complete understanding of the record in *Zabkowicz* and the court's ruling makes clear that the examiner's determinations on motive do not employ a legal principle inconsistent with *Zabkowicz*.

In *Zabkowicz*, the incidents that were evidence of a hostile work environment were directed at Zabkowicz and were sexual in nature: One employee asked her if she wore a bra; at least two coworkers exposed their buttocks to her numerous times; one employee grabbed his crotch and addressed comments to her; employees used sexually offensive language directed at her in her presence; sexually explicit and demeaning drawings were posted, often with her initials on them, and coworkers understood the drawings were depicting her. It was in this context that the court ruled that the nature of the harassment directed at Zabkowicz was because of her sex, since "the sexually offensive conduct and language used would have been almost irrelevant and would have failed entirely in its crude purpose had the plaintiff been a man." *Zabkowicz*, 589 F. Supp. at 784.

In contrast, the two incidents the examiner discussed in this case showed hostility directed at Kannenberg but not in sexual terms. These two situations were not ones in which the language and conduct directed at Kannenberg would have been irrelevant had she been a man. Therefore, if there is substantial evidence to support a finding that the hostility of these two employees—expressed as it was in non-sexual terms—had origins in personality clashes rather than in their attitudes toward Kannenberg because of her gender, the ALJ may properly so find as a fact, after considering all the circumstances.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990), and *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987), do not indicate otherwise. Rather, these two cases point out what we have already noted above: in determining whether the evidence establishes a hostile work environment based on gender, the decision maker must consider all the alleged incidents in context, including incidents of violence and hostility that do not have a sexual expression. These cases require consideration of such incidents and the examiner considered them. These cases do not, however, require that the examiner find such incidents to be motivated by Kannenberg's gender.

Kannenberg also argues that LIRC erred in failing to consider the provision of § 111.31(3), STATS., that the "chapter shall be liberally construed" to accomplish its purpose, which is to "encourage and foster to the fullest extent possible the employment of all qualified individuals regardless of . . . sex." According to Kannenberg, the examiner's and LIRC's failure to mention this provision shows LIRC did not take it into account, and, since the examiner described this as a "close case," the result would have been different had LIRC done so. This argument mixes principles of statutory construction with the concept of burden of proof, and is not persuasive.

■

When statutory language is ambiguous and a choice must be made between two reasonable interpretations, one of the factors to consider in making this choice, if the statute is remedial in nature, is that it is to be liberally construed to effectuate its remedial purpose. *See Butzlaff v. Wisconsin Personnel Commission*, 166 Wis. 2d 1028, 1034–35, 480 N.W.2d 559, 562 (Ct.

App. 1992). We have already concluded that in giving meaning to the statutory term, "intimidating, hostile, or offensive work environment," LIRC correctly applied the federal cases that Kannenberg asserts should be applied. We do not understand Kannenberg to argue that LIRC must apply a more liberal standard than the federal cases, as that would be completely inconsistent with her other arguments. Rather, we understand her to say that because of the "liberal purpose" provision, when LIRC applies the standards established in the federal cases to the facts of a particular case, LIRC must find a violation of § 111.36(1)(b) or (br), STATS., in a "close case." The effect of such a rule is to establish a lower burden of proof for the complainant. Kannenberg cites no authority for employing the "liberal construction" language of a statute in such a manner. For these reasons, we reject this argument.

Having concluded that LIRC used appropriate standards from federal case law to decide the sexual harassment claim, we now decide whether the decision that Kannenberg did not establish sexual harassment is based on factual findings that are supported by substantial evidence and is a reasonable application of the law to the facts. After reviewing all the evidence, we conclude that it is. There is substantial evidence that some of the incidents that were non-sexual in expression were motivated by hostility unrelated to Kannenberg's sex. The findings on the nature and frequency of the other incidents are supported by substantial evidence. We cannot say that LIRC's conclusion—that a reasonable person under the same circumstances as Kannenberg would not consider these incidents sufficiently severe and pervasive to create a hostile work environment—is unreasonable. Looking

to federal cases to see where they have "drawn the line," we observe that the evidence presented here is more like those in which no sexual harassment was found, *see, e.g., Baskerville*, 50 F.3d at 431 (nine incidents of sexual or vulgar comments directed at complainant by her boss over seven months did not create a hostile work environment), than those in which sexual harassment was found. *See, e.g., Zabkowicz*, 589 F. Supp. at 785 (conduct described earlier in this opinion was repeated and frequent over three to four years). We are not condoning the behavior of some of Kannenberg's coworkers. However, we conclude that LIRC could reasonably decide that the number, severity and frequency of the offensive incidents did not establish a violation of § 111.36(1)(b) or (br), STATS.

Finally, we address LIRC's decision that Walker did not retaliate against Kannenberg for complaining about sexual harassment. To show unlawful retaliation under the WFEA, the employee must show that he or she engaged in protected activity, was subject to adverse employment decisions, and that there was a causal connection between the two facts. *Acharya v. Carroll*, 152 Wis. 2d 330, 340, 448 N.W.2d 275, 280 (Ct. App. 1989). If the employee makes this showing, the employer may rebut the claim of retaliation by articulating a legitimate, nondiscriminatory reason for its action. *Id.* If the employer meets that burden, the employee may prevail by presenting evidence that the proffered reason was a pretext. *Id.*

Kannenberg challenges the conclusion of no retaliation because LIRC made no finding of fact that the discipline over the incident with the supplier took place during the investigation of the first ERD complaint.

Although there is no express finding, it is clear from the dates stated in the decision that the incident and discipline took place after Kannenberg filed the first ERD complaint. This fact is not in dispute. However, the timing of a complaint and discipline does not in itself establish retaliation. *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992). The determination that the discipline was not motivated by Kannenberg's protected activity but that Walker had a legitimate, nondiscriminatory reason for the written warning is supported by substantial evidence: that Walker had identified two years earlier in evaluations that Kannenberg had difficulty in cooperating with others and that the discipline was prompted by a supplier's unsolicited comment to an employee and a good faith consideration of the incident by Walker. Kannenberg points to evidence she believes supports a contrary finding, but we must affirm LIRC's findings because they are based on substantial evidence.

*By the Court.*—Judgment affirmed.