JIM WALTER COLOR SEPARATIONS, Petitioner-
Respondent,

v.

LABOR AND INDUSTRY REVIEW COMMISSION, Respondent-
Appellant,

Marcy Ann TOBIAS, Respondent-Co-Appellant.

Court of Appeals

*No. 98–2360. Submitted on briefs February 26,
1999.—Decided April 8, 1999.*

(Also reported in 595 N.W.2d 68.)

On behalf of the Labor and Industry Review Com-
mission, respondent-appellant, the cause was

submitted on the brief of *James E. Doyle*, attorney general, and *David C. Rice*, assistant attorney general.

On behalf of Mary Ann Tobias, respondent-co-appellant, the cause was submitted on the briefs of *Amy F. Scarr* of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *William M. Cunningham* of Beloit.

Before Vergeront, Roggensack and Deininger, JJ.

VERGERONT, J. This appeal requires us to construe provisions of the Wisconsin Fair Employment Act (WFEA) prohibiting sexual harassment. Marcy Ann Tobias and the Wisconsin Labor and Industry Review Commission (LIRC) appeal the judgment of the trial court reversing LIRC's decision that Tobias' former employer, Jim Walter Color Separations, discriminated against Tobias on the basis of sex by engaging in sexual harassment. They contend that LIRC's interpretation of § 111.36(1)(b), STATS., is correct—that the statute does not require that the sexually harassing conduct create a hostile work environment when the person engaging in the conduct is the owner or an agent of the employer under the principles of respondeat superior—and the trial court erred in not applying LIRC's interpretation. We conclude LIRC properly interpreted the statute, and its findings are supported by substantial evidence. We therefore reverse the judgment of the trial court and direct that it affirm LIRC's decision and order.

## BACKGROUND

Jim Walter Color Separations (JWCS) is a small, family-owned business that makes pre-press color sep-

arations for the printing trade. At the time Tobias began working for JWCS, in March 1988, Jim Walter and his wife were the sole owners of the business. JWCS incorporated in approximately 1991 and the current owners are Jim Walter; Mary Walter, his wife; Sherri O'Brien, Mary Walter's daughter; and Paul O'Brien, Sherri O'Brien's husband. Jim Walter is the president of JWCS and Paul O'Brien is the vice-president. Both Jim Walter and Paul O'Brien supervised Tobias.

Tobias claims that during the six-and-one-half years she worked for JWCS, she was subjected to numerous instances of sexual harassment by Paul O'Brien. On September 20, 1994, Tobias left work after a heated disagreement with O'Brien, and six days later she resigned, after reading a letter to Walter and O'Brien which mentioned several instances of sexual harassment by O'Brien.

Tobias filed a discrimination complaint with the Department of Industry, Labor and Human Relations (DILHR) on January 20, 1995, alleging that she had to quit her job at JWCS because she had been "sexually and emotionally harassed to the point that [she] . . . could no longer work under those circumstances." Her second complaint, filed two months later, alleged "[h]arassment based on sex" and included specific allegations of conduct by O'Brien.

After a three-day hearing, the administrative law judge (ALJ) issued a decision concluding that JWCS had not discriminated against Tobias based on sex by constructively discharging her, but had discriminated against her based on sex by engaging in or permitting sexual harassment.[1] It ordered JWCS to pay reasona-

---

[1] The ALJ also decided Tobias' complaint was timely, but that issue is not relevant to this appeal.

ble attorney fees and costs in the amount of $6,594.06, after determining this was a reasonable amount for the issue on which Tobias prevailed. Each party petitioned for review by LIRC. LIRC affirmed the ALJ's decision on both sexual harassment and constructive discharge, and awarded an additional $1,500 to Tobias in attorney fees for responding to JWCS's petition for review.

LIRC adopted the findings of the ALJ, with certain modifications. The relevant findings, as modified, are as follows. Paul O'Brien was Tobias' supervisor for the last three years of her employment with JWCS. On May 19, 1988, he attempted to kiss Tobias on the lips for her birthday; he apologized the next day, indicating that what he did was inappropriate. In April or May of 1989, O'Brien came into the dark room where Tobias was working, asked her to hold out her hand, put a chocolate egg in her hand, and attempted to kiss her; his lips brushed her neck as she turned away. He later apologized. In early 1991, Tobias was wearing a sweatshirt that had zippers across the chest area; O'Brien referred to it as her "breast feeding sweatshirt." In the latter part of 1991, O'Brien was present when a client complimented Tobias on her blouse, and he said, "Yes, well, I kinda like what's under it myself." In early 1992, O'Brien again commented that Tobias was wearing her "breast feeding sweatshirt." In the summer of 1992, as Tobias entered the back seat of a car, preparing to leave a picnic with several others from JWCS, O'Brien slapped her on the rear. On one occasion, after Tobias lost some weight, O'Brien commented that he wondered why Tobias' "boobs" never got any smaller, because his wife's did after she lost weight. In May 1994, O'Brien threw a kernel of popcorn down the front of Tobias' shirt, while she was sitting at a computer, and commented, "It was just so tempting." Shortly

before or after this incident, he slapped her on the rear and laughed.

Posted in JWCS's scanner room or dark room at various times were calendars depicting women in swimsuits or other clothing in sexually suggestive poses and a poster of a naked woman with tattoos all over her body lying on top of a motorcycle. The calendar pictures and poster served no business purpose, and employees, including Tobias, had occasion to enter or use these rooms for business reasons. An image appearing to be a woman in a wet T-shirt was sometimes seen by employees on one of JWCS's computer screens.

LIRC found that JWCS engaged in sex-based and sexual harassment toward Tobias. In its memorandum opinion it explained that the case turned largely on factual disputes, and it was adopting the ALJ's assessment that Tobias was a credible witness and O'Brien was not. LIRC concluded that the instances of unwanted physical contact of a sexual nature and unwelcome verbal conduct of a sexual nature met the definition of sexual harassment in § 111.32(13), STATS., even disregarding the continuing display of the calendars, poster and screen image.[2] LIRC rejected JWCS's argument that the fact that physical and verbal conduct of a sexual nature was tolerated for some time

---

[2] LIRC stated it was also disregarding for purposes of its decision two findings on comments by O'Brien to Tobias, which LIRC considered sexist rather than sexual harassment: O'Brien's comment, in a conversation with Tobias in December 1991, "When I see a woman in a bar, I think she's out there looking to be picked up"; and his comment in February 1994 that when Tobias' divorce was completed she would be "footloose and fancy free," and would quit her job.

meant it was "welcome" within the meaning of the statute.

JWCS appealed LIRC's decision that it had engaged in sexual harassment, and the circuit court reversed. The court concluded that the acts found by LIRC were not sufficiently severe so as to substantially interfere with Tobias' work performance or to create an intimidating, hostile or offensive work environment, and therefore JWCS had not engaged in sex-based and sexual harassment.

## DISCUSSION

We review the decisions of LIRC, not that of the circuit court. *Kannenberg v. LIRC*, 213 Wis. 2d 373, 385 n.4, 571 N.W.2d 165, 171 (1997), *review denied*, 215 Wis. 2d 425, 576 N.W.2d 280 (1997). In reviewing LIRC's decisions, we may not substitute our judgment for that of LIRC as to the weight of the evidence. *See id.* at 384, 571 N.W.2d at 171; § 227.57(6), STATS. Instead, we determine whether the findings of fact are supported by substantial evidence, and if they are, we may not set them aside. *Kannenberg*, 213 Wis. 2d at 384, 571 N.W.2d at 171. Whether LIRC properly interpreted the statute is a question of law, and we are not bound by the agency's interpretation. *Id.* However, we give varying degrees of deference to an agency's interpretation, depending on the circumstances. *Id.* at 385, 571 N.W.2d at 171. LIRC's interpretation and application of the statute defining and prohibiting sexual harassment is entitled to great deference. *Id.* at 387, 571 N.W.2d 172. Under this standard, we uphold an agency's reasonable interpretation of the statute if it is not contrary to the clear meaning of the statute, even if

we conclude another interpretation is more reasonable. *Id.* at 385, 571 N.W.2d at 171–72.

Section 111.36(1), STATS., provides in part:

> (1) Employment discrimination because of sex includes but is not limited to, any of the following actions by any employer . . . :
>
> (b) Engaging in sexual harassment; or implicitly or explicitly making or permitting acquiescence in or submission to sexual harassment a term or condition of employment; or making or permitting acquiescence in, submission to or rejection of sexual harassment the basis or any part of the basis for any employment decision affecting an employe, other than an employment decision that is disciplinary action against an employe for engaging in sexual harassment in violation of this paragraph; or permitting sexual harassment to have the purpose or effect of substantially interfering with an employe's work performance or of creating an intimidating, hostile or offensive work environment. Under this paragraph, substantial interference with an employe's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is such that a reasonable person under the same circumstances as the employe would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.

Section 111.32(13) defines sexual harassment:

> (13) "Sexual harassment" means unwelcome sexual advances, unwelcome requests for sexual favors, unwelcome physical contact of a sexual nature or unwelcome verbal or physical conduct of a sexual nature. "Sexual harassment" includes con-

duct directed by a person at another person of the same or opposite gender. "Unwelcome verbal or physical conduct of a sexual nature" includes but is not limited to the deliberate, repeated making of unsolicited gestures or comments of a sexual nature; the deliberate, repeated display of offensive sexually graphic materials which is not necessary for business purposes; or deliberate verbal or physical conduct of a sexual nature, whether or not repeated, that is sufficiently severe to interfere substantially with an employe's work performance or to create an intimidating, hostile or offensive work environment.

LIRC and Tobias argue that LIRC's findings are supported by substantial evidence, and LIRC's interpretation and application of the statute to the facts it found were reasonable. As it explained in its memorandum opinion, LIRC interprets § 111.32(1)(b), STATS., to provides three separate categories of prohibited conduct: (1) an employer engaging in sexual harassment; (2) an employer explicitly or implicitly making or permitting acquiescence in or submission to sexual harassment a term or condition of employment or the basis of any part of a decision affecting the employee ("quid pro quo"); and (3) permitting sexual harassment to substantially interfere with an employee's work performance or to create an intimidating, hostile or offensive work environment (collectively, "hostile environment"). According to LIRC's interpretation, under the first category, there is employment discrimination based on sex if the employer—that is, the owner or an agent in a position of responsibility such that it is appropriate to apply the rule of respondeat superior and treat the actions of the agent as being the actions of the employer—engages in conduct that meets the defi-

nition of sexual harassment, whether or not that conduct creates a hostile work environment.[3]

JWCS responds, and the trial court apparently agreed, that LIRC's interpretation of the statute is unreasonable and inconsistent with the plain meaning of the statute. According to JWCS, an employer does not engage in sexual harassment unless there is either a quid pro quo or a hostile work environment. Since there is no question in this case concerning the former, JWCS contends, LIRC could not conclude there was discrimination based on sex unless it found that O'Brien's conduct created a hostile work environment for Tobias. JWCS asserts that LIRC did not make that necessary finding, and that the evidence does not support such a finding. JWCS does not challenge any finding as unsupported by substantial evidence, except the determination that JWCS engaged in sex-based and sexual harassment.

We conclude that LIRC's interpretation is consistent with the plain language of §§ 111.36(1)(b) and 111.32(13), STATS. The introductory language of § 111.36(1) makes clear that the subsection is directed to "actions by any employer." In the first sentence of para. (b), various actions are grouped in phrases that are separated by semicolons followed by the word "or." Under the ordinary rules of grammar, the conduct in each phrase is a distinct basis for a violation of the prohibition against discrimination based on sex. The first phrase of the first sentence is "[e]ngaging in sexual harassment." The second and third phrases concern making or permitting terms or conditions of

---

[3] Tobias and LIRC offer other theories of liability on which to sustain LIRC's decision. However, in view of our conclusion on LIRC's statutory interpretation, we do not address the other theories.

employment or employment decisions that are based on "quid pro quo." The fourth and last phrase refers to permitting sexual harassment to create a hostile work environment. The second sentence further defines the fourth phrase. LIRC's reading of this section to create three separate categories of prohibited conduct by an employer (treating the second and third phrase as creating one "quid pro quo" category) is consistent with the plain language of this section. The first category is directed to conduct the employer itself engages in; the second category ("quid pro quo") to conduct the employer either engages in or permits, and the third (hostile work environment) to conduct the employer permits.

■

In construing the first category of prohibited conduct, "[e]ngaging in sexual harassment," we must next turn to the statutory definition of sexual harassment in § 111.32(13), STATS. The first sentence contains a number of alternative definitions, one being "unwelcome physical contact of a sexual nature" and another being "unwelcome verbal or physical conduct of a sexual nature." It is true that the latter definition is further subdivided in the third sentence into alternatives, one being "deliberate verbal or physical conduct of a sexual nature, whether or not repeated, that is sufficiently severe to interfere substantially with an employe's work performance or to create an intimidating, hostile or offensive work environment." But the third sentence plainly states that "[u]nwelcome verbal or physical conduct of a sexual nature includes but is not limited to" those alternative definitions. Therefore, we conclude "unwelcome physical contact of a sexual nature" and "unwelcome verbal or physical conduct of a sexual

nature" may constitute sexual harassment even though they do not create a hostile work environment.

We also conclude that LIRC's interpretation of the statute is a reasonable one. As LIRC explained in its memorandum opinion, the third category of prohibited conduct in § 111.36(1)(b), STATS., permitting a hostile work environment, is "necessary to address sexual harassment engaged in by co-workers who can not be treated as outright agents of the employer in connection with their harassing behavior. [This category] obliges [sic] the employer to take steps to prevent or terminate sexual harassment in the work place, even if the employer (or its agents) is itself not 'engaging in' the sexual harassment, if the harassment engaged in by other employes is severe enough that it . . . interferes with work or creates a hostile, intimidating environment." JWCS argues that LIRC's interpretation of the statute has the effect of creating a stricter standard when an employer (an owner or an agent under the principle of respondeat superior) engages in sexual harassment than when a co-employee does, because in the former situation the conduct need not be severe enough to create a hostile work environment. Assuming it is true that LIRC's interpretation does create a stricter standard when the employer's own conduct is at issue,[4] we do not agree that is unreasonable. Owners and agents under the principle of respondeat superior know their own conduct toward an employee but do not necessarily know the conduct of one employee to another; they can control their own conduct in a way

---

[4] We are assuming JWCS is here comparing the first category ("[e]ngaging in sexual harassment") and the third category (permitting sexual harassment to create a hostile work environment) in § 111.36(1)(b), STATS., and not the second ("quid pro quo") category.

345

they cannot necessarily control the conduct of one employee to another.

JWCS relies on several federal court decisions that apply a hostile work environment standard, and the trial court also relied on those cases in reaching its conclusion. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995). We have recognized that it is appropriate to look to federal decisions interpreting Title VII for guidance in interpreting the WFEA. *Kannenburg*, 213 Wis. 2d at 387, 571 N.W.2d at 172. However, Title VII is not automatically incorporated into the WFEA. *See American Motors Corp. v. DILHR*, 101 Wis. 2d 337, 353, 305 N.W.2d 62, 69 (1981). We conclude the federal cases JWCS cites do not provide guidance for the issue presented on this appeal.

In *Kannenburg*, 213 Wis. 2d at 388, 571 N.W.2d at 173, LIRC had relied on federal cases—*Harris* and *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986), among others—in deciding that the employer there did not violate WFEA by permitting sexual harassment or harassment because of gender[5] to create a hostile work

---

[5] Section 111.36(1), STATS., provides in part:

(1) Employment discrimination because of sex includes, but is not limited to, any of the following actions by any employer, labor organization, employment agency, licensing agency or other person:

. . . .

(br) Engaging in harassment that consists of unwelcome verbal or physical conduct directed at another individual because of that individual's gender, other than the conduct described in par. (b), and that has the purpose or effect of creating an intimidating, hostile or offensive work environment or has the purpose or effect of substantially interfering with that individual's work performance. Under this paragraph, substantial interference with an employe's work performance or creation of an intimidating, hostile or offensive work environment is established when the conduct is

environment. The conduct Kannenberg alleged to be gender-based harassment and sexual harassment was that of co-employees. *Id.* at 377–84, 571 N.W.2d at 168–71. We analyzed the federal cases LIRC had relied on, rejecting Kannenburg's argument that LIRC had erroneously interpreted the federal cases in determining what constitutes a hostile work environment.

*Kannenburg* concerned the proper standard for determining a hostile work environment when the conduct at issue is that of co-employees, but did not address the issue presented in this case: whether § 111.36(1)(b), STATS., may reasonably be interpreted to provide that an owner or agent under the principle of respondeat superior can engage in sexual harassment without a finding that the conduct created a hostile work environment. Title VII, unlike WEFA, does not expressly refer to sexual harassment at all, but simply makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e–2(a). It was this language that the Supreme Court was interpreting in *Meritor*, 477 U.S. at 66, and the Court there concluded that the federal statute did encompass discrimination based on sex that creates a hostile or abusive work environment.

Because Title VII does not contain any language similar to § 111.36(1)(b), STATS., the cases cited by JWCS discussing and applying the standard for a hostile work environment, recognized in *Meritor*, do not support its position that LIRC's interpretation of

such that a reasonable person under the same circumstances as the employe would consider the conduct sufficiently severe or pervasive to interfere substantially with the person's work performance or to create an intimidating, hostile or offensive work environment.

§ 111.36(1)(b) is unreasonable and inconsistent with the statutory language. Those federal cases are helpful only if we first decide that LIRC must find that O'Brien's conduct created a hostile work environment in order to conclude that JWCS engaged in sexual harassment.

In summary, we conclude that LIRC's interpretation of § 111.36(1)(b), STATS., is reasonable and not contrary to the clear meaning of the statute. Under LIRC's interpretation, an employer violates § 111.36(1)(b) if the owner or an agent under the principle of respondeat superior engages in sexual harassment as defined in § 111.32(13), STATS. LIRC's finding that JWCS did engage in sex-based and sexual harassment under this standard is supported by substantial evidence.

*By the Court.*—Judgment and order reversed.